# STATE OF CONNECTICUT *v.* DAVID LAWRENCE
## (SC 17452)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Gruendel, Js.*

* This case originally was argued before a panel of this court consisting of Justices Borden, Katz, Palmer, Vertefeuille and Zarella. Thereafter, the court, sua sponte, ordered that the case be considered en banc. See Practice Book § 70-7 (b). Accordingly, Justice Norcott and Judge Gruendel were added to the panel, and they have read the record, briefs and transcript of the oral argument.

Argued October 23, 2006—officially released April 24, 2007

*Daniel J. Krisch*, with whom were *Brendon P. Levesque*, and, on the brief, *Clarisse N. Thomas*, legal intern, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John Davenport*, senior assistant state's attorney, for the appellee (state).

*Moira L. Buckley* and *Morgan P. Reuckert* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

BORDEN, J. The defendant, David Lawrence, appeals[1] from the judgment of conviction, rendered after a jury trial, of two counts of possession of narcotics with intent to sell, one count of conspiracy to possess narcotics with intent to sell, and one count of possession of a controlled substance with intent to sell within 1500 feet of a licensed child day care center. The defendant claims that the trial court improperly: (1) denied his motion to suppress certain oral and written statements made to the police; and (2) instructed the jury concerning the presumption of innocence and the state's burden of proof. We affirm the judgment of the trial court.

---

[1] We transferred the defendant's appeal from the Appellate Court to this court pursuant to Practice Book § 65-4 and General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

The defendant was charged by substitute information with two counts of possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (a), one count of conspiracy to possess narcotics with intent to sell in violation of General Statutes §§ 21a-278 (a) and 53a-48, and one count of possession of a controlled substance with intent to sell within 1500 feet of a licensed child day care center in violation of General Statutes § 21a-278a (b). Prior to trial, the defendant moved to suppress certain oral and written statements that he had made to the police following their entry into his residence to execute a search warrant. After conducting an evidentiary hearing, the trial court denied the defendant's motion. Thereafter, the jury found the defendant guilty of all charges, and the trial court rendered judgments of conviction in accordance with the jury's verdict. This appeal followed.

The jury reasonably could have found the following relevant facts. In June, 2001, the defendant resided at 95 Ives Street in the city of Waterbury with his wife, Beverly Lawrence (Beverly), their two minor children and their four minor grandchildren, of whom they had legal custody.[2] On the evening of June 21, 2001, officers from the Waterbury police department executed a search warrant for the defendant's residence. In a bureau located in the second floor master bedroom, the officers found a brown paper bag containing approximately 106 grams of powder cocaine and 15.5 grams of crack cocaine separated and packaged in forty-eight small plastic bags. They also found a digital scale, empty plastic bags and an open box of baking soda containing a razor. Additionally, in Beverly's purse, the police found twenty-eight small plastic bags each containing crack cocaine. The amount, as well as the type and packaging of the cocaine found in the defendant's resi-

[2] The defendant's residence at 95 Ives Street is located within a 1500 foot radius of Slocum School Head Start, a licensed child day care center.

dence, was consistent with commercial sale, rather than personal use. The defendant confessed, both orally and in writing, that all of the cocaine and packaging paraphernalia belonged to him. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his motion to suppress certain oral and written statements that he had made to the police concerning ownership of the cocaine and packaging paraphernalia found in his residence. The defendant claims that these statements were the product of police coercion, namely, the threat that the department of children and families would remove his children and grandchildren from his home unless he confessed to owning the cocaine. In support of this claim, the defendant makes two arguments. First, the defendant contends that the trial court improperly found, based on a preponderance of the evidence, that the alleged threats had not occurred and, therefore, that the defendant's statements had been made voluntarily. Alternatively, the defendant urges this court to overrule *State* v. *James*, 237 Conn. 390, 412–26, 678 A.2d 1338 (1996), wherein we concluded that the constitution of Connecticut, like the constitution of the United States, requires the state to establish the voluntariness of a confession by a preponderance of the evidence. See *Lego* v. *Twomey*, 404 U.S. 477, 486, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972). The defendant contends that sister state authority, the unique history of this state and public policy considerations compel the conclusion that the constitution of Connecticut requires the state to meet a higher burden of proof—specifically, proof beyond a reasonable doubt—than is mandated by the federal constitution. The defendant further claims that the evidence adduced by the state was insufficient to establish the voluntariness of his confession beyond a reasonable doubt. We

conclude that the trial court's finding of fact concerning the occurrence of the alleged threats is not clearly erroneous. Additionally, we decline the defendant's invitation to overrule *James*.

The following additional facts and procedural history are necessary for our resolution of this claim. On August 14, 2003, the defendant filed a motion to suppress "any oral or written statements made by him to law enforcement authorities in connection with the [present] case" because, inter alia, the "statements in question were not given voluntarily" and, therefore, had been obtained in violation of the defendant's due process rights under article first, § 8, of the constitution of Connecticut.[3] In support of the motion, the defendant claimed that the constitution of Connecticut requires the state to establish the voluntariness of a confession beyond a reasonable doubt. The defendant further claimed that his oral and written statements were the product of police coercion because "one of the police officers told the defendant that if he did not confess to the ownership of the narcotics . . . the police would have [the department of children and families] come to the residence and take his children away."

At the suppression hearing, both the state and the defendant stipulated that Michael Goggin, a detective with the Waterbury police department, who allegedly had threatened the defendant, was unavailable to testify. Upon the state's motion, the trial court admitted into evidence Goggin's prior testimony at the defendant's probable cause hearing. Goggin testified that, on June 21, 2001, he assisted in the execution of a search warrant for the defendant's residence. Upon entry into the home, Goggin secured the defendant, advised him

---

[3] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and directed him to a bedroom on the second floor. Goggin then asked the defendant "where the narcotics were hidden." The defendant responded that, "he didn't know what [Goggin] was talking about." Goggin informed the defendant that the police were going to commence the search, to which the defendant responded, "[g]o ahead." Goggin proceeded to search the defendant's bedroom, wherein he found a paper bag containing both powder and crack cocaine in the defendant's bureau. The defendant admitted that the cocaine belonged to him. Thereafter, the defendant was transported to police headquarters, where he repeated his confession in a sworn written statement.[4] With respect to the circumstances surrounding the production of the defendant's written statement, Goggin explained that he questioned the defendant alone and that, based on his conversation with the defendant, he typed the defendant's statement, which the defendant then signed.

The state also presented the testimony of Patrick Moynihan, a Waterbury police detective who had

---

[4] The defendant's written statement provides: "I, David Lawrence, age [forty-six], give the following statement to Detective Goggin of my own free will and say that no threats or promises have been made to me. I understand that I am under arrest for narcotics. Detective Goggin has advised me of my rights which I understand and which I waive. I understand that this statement can be used against me in a court of law. Tonight the [p]olice came to my home, 95 Ives Street, with a search and seizure warrant for drugs. The [p]olice searched my home and in my bedroom, they found all of my cocaine. The [p]olice found approximately [four] ounces of powder cocaine and some crack cocaine already packaged for street sale. I knew that I was caught and decided to cooperate with the [p]olice. I do not have a job and sell cocaine to make money. The [p]olice also found money in my bedroom. The money they found, was money, that I made from selling cocaine. I just want to say that all the drugs found in my bedroom tonight, belongs to me and no one else. My wife, Beverly Lawrence has nothing to do with my cocaine business. I purchase the cocaine by myself and I package and sell the cocaine all by [myself]. I know what I was doing was wrong and I am sorry. I have read this statement and it is the truth."

assisted in the execution of the search warrant. Moynihan testified that, upon entry into the defendant's residence, Goggin secured the defendant, advised him of his *Miranda* rights and directed him to a bedroom on the second floor where he spoke to the defendant privately in an attempt to elicit information regarding the presence and location of narcotics in the residence.[5] Moynihan, who was situated in the hallway outside of the second floor bedroom, overheard "[b]its and pieces" of the conversation and monitored Goggin and the defendant visually from an approximate distance of ten feet. Moynihan testified that neither Goggin nor any other police officer had threatened the defendant with the removal of his children and grandchildren by the department of children and families.

Frank Koshes, a sergeant in the vice and intelligence unit of the Waterbury police department, also testified at the suppression hearing. Koshes, who had assisted in the search of the defendant's residence and in the transportation of the defendant to police headquarters, testified that neither Goggin nor any other police officer had threatened the defendant. Koshes further testified that he was stationed immediately outside of the office where Goggin interviewed the defendant, and that the door was partially open so that he could "go right in and intervene" if "voices got raised, or if there was any kind of problem . . . ." Koshes did not hear raised voices or anything unusual during the interview, however, that would necessitate his intervention. At the conclusion of the interview, Koshes reviewed the defendant's written statement. After evaluating the defen-

---

[5] Moynihan testified that it was the police department's "normal course of action" to attempt to obtain "as much information from [the target of the investigation] as we can regarding the investigation, or what we are seeking at that apartment. In turn, [we might] not [have] to turn the apartment upside down and seek out any drugs or weapons that we might be looking for."

dant's literacy proficiency,[6] Koshes asked the defendant to read the statement to himself, which the defendant did. Koshes then asked the defendant "if everything within the statement was the truth," to which the defendant responded, "[y]es."

The defendant testified at the suppression hearing on his own behalf. The defendant testified that, in 1998, he and Beverly lived in North Carolina with their two minor children and their four minor grandchildren, of whom they had physical, but not legal, custody. In October of that year, Beverly brought the children and grandchildren to Connecticut to visit Althea Vines, the adult daughter of the defendant and Beverly and the mother of their four grandchildren. One afternoon, Beverly left her children and grandchildren in the care of Vines while she went shopping. The defendant testified that when Beverly returned, she discovered that Vines had gotten into "some type of argument with someone, and . . . the police were called, and when they came in, there were drugs found at the residence. So, at that point, the kids were . . . taken away from [Vines] and placed in the custody of the [department of children and families]." The department of children and families released the defendant's children into Beverly's custody later that same day. Because neither Beverly nor the defendant had legal custody of their grandchildren, however, the grandchildren were held for approximately ninety-six hours. In the meantime, the defendant traveled to Connecticut to assist Beverly in securing the safe return of their grandchildren. After the expiration of the ninety-six hour period, the department of children and families released the four grandchildren into the physical custody of the defendant on the condi-

---

[6] Koshes first asked the defendant if he could read and write the English language, to which the defendant responded, "yes." Koshes then asked the defendant to read the first sentence of the statement aloud, which the defendant did accurately.

tion that the grandchildren remain in the state. In light of this condition, the defendant moved his family from North Carolina to Connecticut and began the lengthy and arduous process of obtaining legal custody of his grandchildren. He described his experience with the department of children and families as "taxing" and "a nightmare."

The defendant's testimony concerning the events on June 21, 2001, largely mirrored the testimony of Goggin, Moynihan and Koshes, with the exception of Goggin's alleged threats concerning the removal of the defendant's children and grandchildren by the department of children and families. The defendant testified that, prior to commencing the search of his home, Goggin had said, "well, you know, you can make it easier on yourself. Just tell us where the drugs are, and we'll make sure, you know, that [the department of children and families] does not . . . take your kids." After the defendant informed Goggin that no narcotics were present in the home, the police searched the defendant's residence and found cocaine in his bureau. The defendant testified that, "the officer asked me were [the drugs] mine, and I said, no. At that point, when I said no, one of the officers, not the officer that had me in [hand]cuffs, but one of the officers . . . asked me where's the money. I said, what money? He said, do you have any more drugs or money in this house? I said, no, there's no more drugs or money in this house. What you say you found, apparently that's it. He said, well, we know there's more drugs . . . in this house. We are going to have [the department of children and families] come in and take your kids. At that point, with the thought of . . . what I had already gone through with [the department of children and families], I said to him, I said, listen, you say you found drugs here, whatever you say you found. I said, I will take total responsibility for that. I do not want my kids or wife

to get caught up in anything like this. I said, I've been through dealing with [the department of children and families] before. I said, I don't want my kids taken away from me, and that's when the officer took me back into the room. At that point was when . . . he said, all right, I'll tell you what I'll do for you. He said, if you will sign a statement for me saying that these drugs are yours, all these drugs are yours, your wife has nothing to do with it, I will make sure that [the department of children and families] does not come in and take your kids."

The defendant subsequently was transported to police headquarters, where he produced a sworn written statement. The defendant testified that, "[b]ecause of what the officer told me at my house about [the department of children and families], that he would make sure that if I gave him a statement that the drugs were mine, and if I gave him a signed statement, he would make sure he absolutely guaranteed me that [the department of children and families] would not come in and take my kids. And that was the most important thing in my mind, because I had dealt with [the department of children and families] before, and I had my four grandkids living with me already in North Carolina, and the reason being, was because of my daughter's— my daughter was young at the time she had the kids, so we've always had the kids with us, and I always did the best I could to try to keep my family together. And because of the dealings with [the department of children and families] and because of just trying to keep my family together, that was the reason that I gave them that statement, because he absolutely assured me that [the department of children and families] would not come in and take my kids if I gave him a statement."

On March 1, 2004, the trial court denied the defendant's motion to suppress. The trial court rejected the defendant's claim that it must apply the reasonable doubt standard and, instead, followed "the existing law of Connecticut when making [its] determinations,

which is by a preponderance of the evidence." The trial court observed that, "[t]here is no evidence offered, other than the [defendant's testimony]," that the alleged threats concerning the department of children and families actually had occurred. The court stated that, "as fact finder, [it] must assess credibility and that includes that of the defendant's testimony. Accrediting his testimony, his interest in the outcome of the case, the consistency of his testimony with other witnesses, but for the [department of children and families] issue, leads this fact finder to question its existence." The trial court therefore did not find "the defendant's testimony on that issue credible" and "decline[d] to credit that portion of the defendant's testimony."[7] Accordingly, the trial court concluded that, "the state has sustained its burden [of establishing] that the oral and written statements of the defendant [were] freely given . . . ."[8]

---

[7] On February 3, 2005, the defendant moved for an articulation of the trial court's ruling with respect to, inter alia, "the specific facts that led the trial court to disbelieve the defendant's testimony regarding the alleged threats of involvement [by the department of children and families] made by a Waterbury police detective?" The trial court denied the defendant's motion. Thereafter, the defendant moved the Appellate Court to review the trial court's denial of his motion for articulation. The Appellate Court granted the motion for review, but denied the relief requested therein.

[8] The trial court found the following additional facts pertinent to the voluntariness of the defendant's statements: (1) the defendant was forty-six years of age, intelligent, and able to read and write the English language; (2) "[t]here is no indication in the evidence that the [length of the defendant's] detention in any way seemed to overwhelm the defendant's will or reasoning process"; (3) "[t]here is no indication that the defendant was subjected to anything like the kind of exhausting or incessant questioning the courts have found troubling"; (4) "[t]here is nothing in the record from which the court can conclude that the defendant was sleep deprived, asleep or even tired"; (5) "[i]t is not alleged that the defendant was in any way whatsoever, physically abused or punished while giving the statement, nor is there any evidence of that"; and (6) "[t]he evidence establishes that the defendant was cooperative and in full possession of his faculties when he spoke to the police." The trial court concluded that, "[c]onsidering the totality of the circumstances, there is no evidence that the defendant's decision to waive his rights and talk to the police was anything other than the result of his free, considered and understood choice."

The principles governing our review of the trial court's ruling are well established. "[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . .

"To begin, we note the established rule that [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . .

"[A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with

the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 418–20, 736 A.2d 857 (1999). Accordingly, we "conduct a plenary review of the record in order to make an independent determination of voluntariness." Id., 421.

## A

We first address the defendant's claim that the trial court improperly found that Goggin had not threatened the defendant with the removal of his children and grandchildren by the department of children and families. The defendant claims that this finding of fact is clearly erroneous because Goggin was unavailable to testify at the suppression hearing and, therefore, the trial court did not have the opportunity to assess personally Goggin's credibility. Additionally, the defendant contends that Goggin's prior testimony at the defendant's probable cause hearing, which was admitted into evidence at the suppression hearing, did not address the voluntariness of the defendant's statements and, therefore, "gave the trial court no insight into whether . . . the threats [of removal had] occurred." We conclude that the trial court's factual finding concerning the occurrence of the alleged threats is not clearly erroneous.

"The law governing [our] limited appellate review is clear. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great

deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 558–59, 893 A.2d 389 (2006) (*Pellegrino, J.*, dissenting).

At the suppression hearing, the defendant testified that he admitted to ownership of the cocaine only because Goggin had threatened that the department of children and families would remove his children and grandchildren from his home if he did not confess. Both Moynihan and Koshes testified, however, that neither Goggin nor any other police officer had threatened the defendant. Moreover, Goggin, who testified as to the circumstances leading to the defendant's oral and written statements, did not mention that these statements had been precipitated by any threats or references to the department of children and families. The trial court resolved the conflicting evidence in favor of the state, finding that the alleged threats had not occurred. Specifically, the trial court did not find the defendant's testimony concerning the alleged threats to be credible and, therefore, declined to credit it. It is well established that "[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom."

(Citation omitted; internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 40, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004). We defer to the trial court's assessments concerning credibility and, therefore, conclude that the evidence was sufficient to support the trial court's finding that the alleged threats had not occurred. See, e.g., *State* v. *James*, supra, 237 Conn. 427 ("[t]he court reasonably credited the police version of the events leading up to the defendant's confession, and we will not retry those credibility determinations on appeal"). Accordingly, the trial court's factual finding is not clearly erroneous.

The defendant claims, however, that although this court ordinarily defers to the trial court's assessment of credibility, such deference is unwarranted in this case because the trial did not have the opportunity to observe personally the in-court testimony of the relevant witnesses. Specifically, the defendant claims that because the trial court did not have the opportunity to observe Goggin's conduct, demeanor and attitude on the witness stand, and because the trial court's assessment of the defendant's credibility necessarily is intertwined with its assessment of Goggin's credibility, we should afford no deference to the trial court's credibility assessments. We reject this claim for two reasons. First, although the trial court did not have the opportunity to observe Goggin's in-court testimony, it did have the opportunity to observe the defendant's in-court testimony, which it did not find credible. Second, the defendant misapprehends the fundamental distinction between the function of the fact finder, which is to make credibility determinations and to find facts, and the function of the appellate tribunal, which is "to review, and not to retry, the proceedings of the trial court." *In re Quanitra M.*, 60 Conn. App. 96, 106, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909

(2000). In light of our limited function, it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations. Cf. *Besade* v. *Interstate Security Services*, 212 Conn. 441, 447–49, 562 A.2d 1086 (1989) (rejecting claim that this court need not defer to factual findings because evidence largely was documentary and, therefore, findings were not based on personal appraisal of witness' demeanor).

The defendant next claims that, in finding that the alleged threats had not occurred, the trial court improperly relied on Goggin's prior testimony from the probable cause hearing at which the voluntariness of the defendant's statements and, thus, the occurrence of the alleged threats, was not at issue.[9] We reject this claim. Goggin testified with respect to the circumstances surrounding the search of the defendant's home, the discovery of the cocaine in the defendant's bureau, and the defendant's subsequent oral and written admissions concerning ownership of the cocaine. At no point did Goggin mention that either he or any other police officer had threatened the defendant in any manner. Accordingly, the trial court reasonably could have inferred from Goggin's testimony that the alleged threats had not occurred. See *State* v. *Laracuente*, 205 Conn. 515, 526, 534 A.2d 882 (1987) ("It is . . . the [trier of fact's] prerogative to draw reasonable and logical inferences from the facts found proven. . . . A reasonable inference is a conclusion arrived at by a process of reasoning. This conclusion must be a rational and logical deduction from facts admitted or established by the

[9] Although the extent to which the trial court relied on Goggin's prior testimony is unclear, we assume for the purpose of our analysis of the defendant's claim that the trial court relied, at least in part, on Goggin's prior testimony to find that the alleged threats involving the department of children and families had not occurred.

evidence, when such facts are viewed in the light of common knowledge or common experience." [Citation omitted; internal quotation marks omitted.]), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988). Moreover, both Moynihan and Koshes testified that neither Goggin nor any other police officer had threatened the defendant. In light of the evidence adduced at the suppression hearing, and the reasonable inferences drawn therefrom, we conclude that ample evidence existed in the record to support the trial court's factual finding that the alleged threats involving the department of children and families had not occurred.

B

The defendant next claims that this court should overrule *State* v. *James*, supra, 237 Conn. 412–26, in which we concluded that the due process clause of article first, § 8, of the constitution of Connecticut requires the voluntariness of a confession to be established by a preponderance of the evidence only. The defendant claims that three elements of constitutional analysis enumerated in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992),[10] compel the conclusion that the constitution of Connecticut requires the state to meet a higher burden of proof to establish the voluntariness of a confession, namely, proof beyond a reasonable doubt. We are not persuaded that *James* was wrongly

---

[10] In *Geisler*, we enumerated the following six factors to be considered in determining whether the constitution of Connecticut provides greater protection to our citizens than the federal constitution: "(1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 561, 881 A.2d 290 (2005), cert. denied, 547 U.S 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

decided and, accordingly, we continue to adhere to the constitutional principles articulated therein.

As a preliminary matter, we briefly review *Lego* v. *Twomey*, supra, 404 U.S. 486, wherein the United States Supreme Court determined that the federal constitution requires the voluntariness of a confession to be established by a preponderance of the evidence, rather than by proof beyond a reasonable doubt. In arriving at this conclusion, the court rejected the claim that "judging the admissibility of a confession by a preponderance of the evidence undermines the mandate of *In re Winship*, 397 U.S. 358 [364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)]," which requires proof of each element of a crime beyond a reasonable doubt. *Lego* v. *Twomey*, supra, 486. The court noted that the purpose of a voluntariness hearing is not to ensure the accuracy and reliability of a jury's verdict, but, rather, to safeguard "the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances." Id., 485. The court therefore concluded that, "[a] guilty verdict is not rendered less reliable or less consonant with [*In re*] *Winship* simply because the admissibility of a confession is determined by a less stringent standard."[11] Id., 487. Moreover, in *Lego*, the court was not convinced that the values served by the exclusionary rules compel the conclusion that the federal constitution requires the admissibility of a

[11] The court observed that, although there may be some relationship between coerced confessions and unreliable confessions, "the exclusion of unreliable confessions is not the purpose that a voluntariness hearing is designed to serve. . . . The sole issue in such a hearing is whether a confession was coerced. Whether it be true or false is irrelevant; indeed, such an inquiry is forbidden. The judge may not take into consideration evidence that would indicate that the confession, though compelled, is reliable, even highly so. . . . As difficult as such tasks may be to accomplish, the judge is also duty-bound to ignore implications of reliability in facts relevant to coercion and to shut from his mind any internal evidence of authenticity that a confession itself may bear." (Citations omitted.) *Lego* v. *Twomey*, supra, 404 U.S. 484–85 n.12.

confession to be proven beyond a reasonable doubt. Id., 488. The court noted that, "no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence"; id.; and, without good cause, the court was "unwilling to expand currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries . . . [particularly because] exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in [f]ourth and [f]ifth amendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." Id., 488–89. Lastly, the court observed that, "the [s]tates are free, pursuant to their own law, to adopt a higher standard." Id., 489.

In *State* v. *Staples*, 175 Conn. 398, 403, 399 A.2d 1269 (1978), the defendant claimed that this court should adopt a more stringent standard to determine the voluntariness of a confession under the Connecticut constitution because "when a confession of guilt is attacked as having been involuntarily obtained, the reliability of the confession is raised and the principle requiring that guilt be proven beyond a reasonable doubt is 'debased' unless it is required that voluntariness be proven by the same standard of proof." Id., 403–404. We rejected this claim because it relied on the "unjustified assumption that a voluntariness hearing [is] designed to enhance the reliability of jury verdicts or to implement the presumption of innocence." Id., 405, citing *Lego* v. *Twomey*, supra, 404 U.S. 482, 485, 487. We relied on *Lego* for the proposition that a guilty verdict is not rendered less reliable or less consonant with *In re Winship*, supra, 397 U.S. 364, simply because the admis-

sibility of a confession is determined by a fair prepon-
derance of the evidence. *State* v. *Staples, supra,*
404–405. We also relied on *Lego* to reject the defendant's
implicit claim that, "the values served by the exclusion-
ary rules, including the deterring of improper police
conduct, independently demand that the reasonable
doubt standard be required in the admissibility of con-
fessions." Id., 405. Because the defendant had failed to
present a "valid reason why proof by [a preponderance
of the evidence], with a judge making a positive finding
on voluntariness, does not provide a fair and workable
test which affords a criminal defendant those rights
guaranteed him by both the United States and Connecti-
cut [c]onstitution[s]"; id., 406; we concluded that, "a
trial court should follow the preponderance of the evi-
dence standard and not the reasonable doubt standard
in determining whether or not the state has sustained
its burden of proving voluntariness when a confession
of a criminal defendant is offered into evidence." Id.,
406–407.

In *State* v. *James, supra,* 237 Conn. 413, the defendant
asked this court to overrule *Staples* and to conclude
that the constitution of Connecticut requires the volun-
tariness of a confession to be established by proof
beyond a reasonable doubt. In support of this claim,
the defendant relied on three *Geisler* factors, namely,
sister state authority, historical considerations, and eco-
nomic and sociological considerations. Id., 413–14.
First, the defendant pointed to the decisions of several
of our sister states that had determined that the volun-
tariness of a confession must be proven beyond a rea-
sonable doubt under state law. Id., 419. Second, the
defendant claimed that "the common-law approach to
the admissibility of confession evidence, as reflected
in certain case law and in commentary by Chief Justice
Zephaniah Swift and William Blackstone, demonstrates
a historical commitment to requiring the state to meet

the highest standard of proof on the voluntariness issue."[12] Id., 414. Third, the defendant advanced two public policy considerations in support of his claim, namely, "that the reasonable doubt standard is necessary both to protect adequately a criminal defendant's right not to be compelled to incriminate himself or herself, and to protect a criminal defendant from an inaccurate jury verdict based on confession evidence." Id., 420–21. For the reasons hereinafter explained, we rejected the defendant's claim.

With respect to sister state authority, we noted that, although a minority of states have concluded that the voluntariness of a confession must be established by proof beyond a reasonable doubt, a "substantial majority of states to have considered this issue have followed *Lego* v. *Twomey*, supra, 404 U.S. 477, and have adopted the preponderance standard under state law. Furthermore, of those states adopting the higher standard, a number have failed to make clear whether their decisions are constitutionally based; see *Bradley* v. *Commonwealth*, 439 S.W.2d 61, 64 (Ky. 1969), cert. denied, 397 U.S. 974, 90 S. Ct. 1091, 25 L. Ed. 2d 268 (1970); *State* v. *Phinney*, 117 N.H. 145, 146, 370 A.2d 1153 (1977); *State* v. *Owens*, 148 Wis. 2d 922, 929–30, 436 N.W.2d 869 (1989); or have done so expressly on non-

---

[12] "See 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 408 ('[C]onfessions are from their nature liable to suspicions . . . so likely to be influenced by hope, or fear, and so liable, like all hearsay evidence to be misrepresented, and changed in the narration, that the law does not suffer them to be received except under peculiar circumstances. . . . [T]he confession must be perfectly voluntary: for if the least degree of influence appear to be exercised over the prisoner's mind, to induce him to disclose his guilt, the whole will be rejected.'); 4 W. Blackstone, Commentaries on the Laws of England (1807) p. 357 ('indeed, even in cases of felony at the common law, [confessions] are the weakest and most suspicious of all testimony; ever liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately, or reported with due precision; and incapable in their nature of being disproved by other negative evidence')." *State* v. *James*, supra, 237 Conn. 416–17 n.29.

constitutional grounds. See *People* v. *Jiminez*, 21 Cal. 3d 595, 605, 580 P.2d 672, 147 Cal. Rptr. 172 (1978) (adopting reasonable doubt standard of proof as 'judicially declared rule of criminal procedure'), rev'd, *People* v. *Markham*, 49 Cal. 3d 63, 65, 775 P.2d 1042, 260 Cal. Rptr. 273 (1989) (pursuant to amendment to state constitution, California law on standard of proof for voluntariness determination is same as federal constitutional law); *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, 430 N.E.2d 1198, cert. denied, 457 U.S. 1137, 102 S. Ct. 2967, 73 L. Ed. 2d 1356 (1982) (reasonable doubt standard imposed as matter of state's 'humane practice' rule). Also, a number of states appear to have adopted the reasonable doubt standard in anticipation of the adoption of such a standard by the [United States] Supreme Court under the federal constitution. See *Burton* v. *State*, 260 Ind. 94, 105, 292 N.E.2d 790 (1973); *Harrison* v. *State*, 285 So. 2d 889, 890 (Miss. 1973); *State* v. *Yough*, 49 N.J. 587, 589–601, 231 A.2d 598 (1967)." *State* v. *James*, supra, 237 Conn. 419–20.

With respect to historical considerations, we noted that, "[t]he authorities relied upon by the defendant reflect the common-law evidentiary rule that a confession may be kept from the jury if the circumstances under which it was given render it unreliable evidence of guilt. . . . The purpose of the rule, which arose during the middle of the eighteenth century, prior to which time extrajudicial confessions were freely admitted . . . was to protect a defendant from an erroneous conviction based upon a false confession. . . . Generally, the approach under the common law rule was to identify certain inducements which made a confession unreliable. . . . As frequently stated, the rule required a confession to be excluded from evidence, as involuntary, if it was obtained as a result of a promise of a benefit or leniency or a threat of harm. . . . This princi-

ple was clearly part of the common law of evidence in this state.

"In *Rogers* v. *Richmond,* 365 U.S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961), however, the [United States] Supreme Court rejected the common law focus on reliability in determining whether a confession is admissible. The court concluded that, under the federal constitution, in determining whether a confession should be excluded as involuntary, the test is whether the defendant's will was overborne, which is to be determined with complete disregard of whether or not the [accused] in fact spoke the truth. . . . This is so, the court reasoned, because involuntary confessions are excluded not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the [s]tate must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. . . .

"It is clear, then, that the common law exclusionary rule employed a different notion of voluntariness and relied upon a different rationale for excluding confession evidence than its constitutional counterpart. The former was an evidentiary rule aimed at safeguarding the trustworthiness of evidence at trial, while the latter is aimed at protecting a criminal defendant's right to be free from compulsion to incriminate himself or herself. Our common law on this issue, is, therefore, of limited usefulness in defining the contours of the constitutional exclusionary rule, for the common law authorities upon which the defendant relies simply did not address themselves to the question of what rule or standards of proof would be appropriate or necessary to effectuate the goal of protecting a criminal defendant's right to be free from coercion, without regard to the

probativeness of the confession produced."[13] (Citations omitted; internal quotation marks omitted.) *State* v. *James*, supra, 237 Conn. 414–16. Accordingly, we concluded that the history of this state did not support the defendant's claim that the constitution of Connecticut requires the voluntariness of a confession to be proven beyond a reasonable doubt. Id., 419.

With respect to the defendant's claim that a voluntariness determination serves the important public interest of ensuring the accuracy of a jury's verdict, we noted that we previously had rejected this claim in *State* v. *Staples*, supra, 175 Conn. 405, because it "is not the primary purpose of the voluntariness inquiry and . . . the reasonable doubt standard is not mandated in order to satisfy the requirement of proof beyond a reasonable doubt on the ultimate issue of guilt." *State* v. *James*,

[13] With respect to the specific commentary by Swift and Blackstone on which the defendant relied; see footnote 12 of this opinion; we noted that, "[t]hese authorities do not address directly the standard of proof on this issue. Furthermore, their advocacy of a stringent rule of exclusion appears to reflect a temporary expansion of the common-law rule during the early nineteenth century that was later rejected. According to Wigmore, the common-law exclusionary rule was initially quite narrow in scope, but underwent significant expansion by English judges, who, largely out of concern arising from the common-law rule prohibiting criminal defendants from testifying in their defense came to espouse mistrust of confessions and to apply the common-law evidentiary rule to require exclusion upon the finding of any conduct that qualified as an inducement, however slight. 3 J. Wigmore [Evidence (Chadbourne Rev. 1970)] §§ 820 and 820a, pp. 297–301 . . . . Wigmore suggested, however, that this formal, exacting approach to confession evidence constituted a distortion of the rule that was not justified by its true rationale—to keep false confessions from the jury—and that, once criminal defendants were permitted to testify in their own trials, it was proper in most cases to submit a confession to the jury. See [id.], §§ 820a and 820b, pp. 300–306. This court in *State* v. *Willis*, [71 Conn. 293, 310–11, 41 A. 820 (1898)], also suggested that the formalistic approach that derived from English case law applying the common-law rule, upon which Swift relied, was unwarranted, and indicated instead that a more moderate, or 'common sense' view should prevail. The defendant points to no case applying the common-law rule that adopts the severe approach to exclusion advanced by these commentators." (Citation omitted.) *State* v. *James*, supra, 237 Conn. 417–18.

supra, 237 Conn. 421. Without retreating from that position, however, we acknowledged that, "the concern that coercion provides a reason to confess falsely is, nevertheless, a long-standing ground for not receiving coerced confessions into evidence, which is reflected in our own common law precedent. Thus, to the extent that there may be a correlation between involuntariness and falsity, this is a relevant consideration.

"We have said that [t]he function of the burden of proof employed by the court is to allocat[e] the risk of error between the litigants and indicat[e] the relative importance of the ultimate decision. . . . [A] standard of proof represents an attempt to instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases preponderance of the evidence and proof beyond a reasonable doubt are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions. . . . Further, the standard of proof influences the relative frequency . . . of erroneous outcomes . . . either in favor of the state when the true facts warrant judgment for the defendant or in favor of the defendant when the true facts warrant judgment for the state. . . . Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each. . . .

"The preponderance standard is said to [require] the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [it] may find in favor of the party who has the burden to persuade the [trier] of the fact's existence . . . and to reflect the

view that the social disutility of an erroneous decision in either direction is comparable. . . . In contrast, the requirement of proof beyond a reasonable doubt dramatically shifts the risk of an erroneous decision, reflecting the view that it is far worse to make an erroneous decision in favor of one party than it is to make it in favor of the other." (Citations omitted; internal quotation marks omitted.) Id., 421–23.

With this background in mind, we addressed the defendant's claim that his right to be free from self-incrimination required the imposition of the standard of proof that minimized, to the greatest extent possible, the risk of an erroneous decision on voluntariness in favor of the state. We observed that, "[t]he state, of course, currently bears the burden of persuasion on the voluntariness issue, and must convince the trial court by a preponderance of the evidence that the confession sought to be admitted was voluntarily given. Our focus in the present inquiry is, therefore, on any incremental gains to be realized from imposing the higher reasonable doubt standard. As the defendant points out, this determination often turns on the trial court's resolution of conflicting testimony by police and the accused. In such circumstances, we believe, it is only in rare cases that the trial court might be convinced by a preponderance of the evidence that a confession is voluntary but nevertheless harbor a reasonable doubt about the same. Although closing this gap would of course benefit defendants in those cases, we are unpersuaded that it would significantly advance the deterrence function of the exclusionary rule. The greatest part of any deterrent effect of exclusion must, in the first instance, be attributed to requiring the prosecution to prove, even by a preponderance, that the confession sought to be admitted was not obtained by improper methods. We are not convinced that the exclusion of confessions in very close cases, under the reasonable

doubt standard, is likely to produce a significant change in the behavior in police officers in pursuing such evidence. Cf. *Lego* v. *Twomey*, supra, 404 U.S. 489. In this regard, we note that the [United States] Supreme Court has indicated that the preponderance standard of proof is sufficient for all determinations of the applicability of an exclusionary rule, which, in its view, is aimed primarily at deterrence. See *Nix* v. *Williams*, 467 U.S. 431, 444–45 n.5, 104 S. Ct. 2501, 81 L. Ed. 2d 371 (1984); see also *Colorado* v. *Connelly*, [479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)] (adopting preponderance standard for preliminary question of validity of *Miranda* waiver).

"We also are unpersuaded that the relationship between the court's preliminary determination of voluntariness and the accuracy of jury verdicts provides a compelling basis for imposing a higher standard of proof. The defendant's contention, and that of some sister states, that this concern is weighty appears to rest on two premises: first, that involuntary confessions are of *highly* suspect reliability, and second, that juries are likely to accept a confession uncritically. With regard to the first, however, the defendant has not suggested, nor do we perceive, that involuntariness necessarily equates with falsity. Although coercion is reasonably thought to create a reason to confess falsely, whether a particular coerced confession is also likely to be false depends on many variables. Thus, the exclusion of a confession where there is a reasonable doubt about its voluntariness does not invariably mean that a false confession has been suppressed. Furthermore, safeguards against the admission of false confessions other than a stringent burden of proof are already in place. The state must demonstrate the corpus delicti of the crime to which the defendant has confessed. . . . Additionally, the defendant . . . [is free] to familiarize a jury with circumstances that attend the taking

of his confession, including facts bearing upon its weight and voluntariness. . . . Before deciding to convict, the jury must determine whether the confession is to be credited, and, if so, whether it is sufficient with any other evidence to demonstrate guilt beyond a reasonable doubt. We have recently reiterated our confidence in the ability of juries to discern the proper weight to be afforded conflicting evidence in this area. . . .

"At stake for the state in the application of any exclusionary rule is its interest in efficient, effective law enforcement. The exclusionary rule at issue occasions the loss of otherwise relevant and powerful evidence of guilt, the loss of which might seriously weaken if not decimate a state's case. The cost of the trial court possibly excluding more confessions because of a higher standard of proof is to permit defendants to avoid trial and a just conviction by a jury, when the jury would have the opportunity to consider all of the circumstances under which the confession was elicited and weigh it accordingly. We are not persuaded that any incremental, indirect or speculative benefit that might flow from imposition of the reasonable doubt standard to the voluntariness determination substantially outweighs its increased costs to effective law enforcement and to the truth seeking process. . . . We remain convinced, rather, that the preponderance standard provides a fair and workable test; *State* v. *Staples*, supra, 175 Conn. 406; that strikes the appropriate balance, in light of our historical background and contemporary policy concerns, between the various interests at stake. The preponderance standard, we believe, is entirely consonant with the general contours of a constitutional safeguard rooted in flexible principles of due process." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *James*, supra, 237 Conn. 423–26.

With this background in mind, we turn to the defendant's claim that *James* was wrongly decided and, therefore, must be overruled. Specifically, the defendant claims that, in *James*, this court improperly analyzed the three *Geisler* factors at issue and, therefore, improperly concluded that the constitution of Connecticut requires the voluntariness of a confession to be established by a preponderance of the evidence only.[14] At the outset, we note that, "[t]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . Stare decisis, however, is not an end in itself. . . . Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. . . . Indeed, [i]f law is to have current relevance, courts must have and exert the capacity to change a rule of law when reason so requires." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 384–85, 897 A.2d 569 (2006).

The defendant first claims that, in *James*, this court improperly declined to follow the lead of those states that require the voluntariness of a confession to be established by proof beyond a reasonable doubt under state law.[15] As we observed in *James*, "[t]hese states

[14] The defendant concedes that the remaining *Geisler* factors, namely, federal precedent, Connecticut precedent and the text of the relevant constitutional provisions do not support the imposition of a higher burden of proof.

[15] The defendant claims that this court improperly concluded in *James* that the jurisprudence of New Hampshire and Wisconsin fails to make clear whether their decisions are constitutionally based. *State* v. *James*, supra, 237 Conn. 420. We agree that, in New Hampshire, the imposition of a more stringent burden of proof clearly is mandated by the state constitution. See *State* v. *Rezk*, 150 N.H. 483, 486, 840 A.2d 758 (2004) (under part I, article 15 of constitution of New Hampshire, state must prove voluntariness of confession beyond reasonable doubt). In *State* v. *Agnello*, 226 Wis. 2d 164,

. . . constitute the minority.[16] The substantial majority of states to have considered this issue have followed *Lego* v. *Twomey*, supra, 404 U.S. 477, and have adopted

179–80, 182, 593 N.W.2d 427 (1999), however, the Wisconsin Supreme Court concluded that the imposition of a more stringent burden of proof is not required by the state constitution. Id., 181 (because "the language in [a]rticle I, [§] 8 of the state constitution is nearly identical to that contained in the [f]ifth [a]mendment to the federal constitution" court could "discern no intended difference between the two provisions"). Even more significantly, in *Agnello*, the court overruled its prior precedent and concluded that, under state law, the voluntariness of a confession need only be proven by a preponderance of the evidence. Id., 179–80, 182. The court reasoned that, not only does the preponderance standard "[align] the burden in voluntariness determinations with the burdens in other pre-trial constitutional inquiries," but it also "does not alter the [s]tate's burden at trial—to prove that the defendant committed the crime beyond a reasonable doubt" and, thus, "the [s]tate's ultimate burden, and the defendant's ultimate protection, remains intact." Id., 181–82.

[16] See *Pruitt* v. *State*, 834 N.E.2d 90, 114–15 (Ind. 2005) ("Indiana [c]onstitution requires the state to prove beyond a reasonable doubt that the defendant voluntarily waived his rights, and that the defendant's confession was voluntarily given" [internal quotation marks omitted]), cert. denied, 548 U.S. 910, 126 S. Ct. 2936, 165 L. Ed. 2d 962 (2006); *State* v. *Peters*, 315 So. 2d 678, 680–81 (La. 1975) (construing various state statutes and article I, [§] 11 of Louisiana constitution to require state to prove voluntariness of confession beyond reasonable doubt); *State* v. *Collins*, 297 A.2d 620, 625–27 (Me. 1972) (constitutional privilege against self-incrimination and public policy require state to establish voluntariness of confession beyond reasonable doubt); *Commonwealth* v. *Tavares*, supra, 385 Mass. 152 ("'humane practice'" requires state to establish voluntariness of confession beyond reasonable doubt); *Neal* v. *State*, 451 So. 2d 743, 753 (Miss.) (en banc) ("[i]t is well established in this [s]tate that, where the voluntariness of a confession has been put in issue, the [s]tate has the burden of proving voluntariness beyond a reasonable doubt"), cert. denied, 469 U.S. 1098, 105 S. Ct. 607, 83 L. Ed. 2d 716 (1984); *State* v. *Rezk*, 150 N.H. 483, 486, 840 A.2d 758 (2004) (under part I, article fifteen of constitution of New Hampshire, state must prove voluntariness of confession beyond reasonable doubt); *State* v. *Yough*, supra, 49 N.J. 601 (although constitution and prior precedent do not require state to establish voluntariness of confession beyond reasonable doubt, such standard better serves "the sound administration of justice"); *People* v. *Huntley*, 15 N.Y.2d 72, 74, 78, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965) (absent controlling decision, statute or rule, state must establish voluntariness of confession beyond reasonable doubt); see also *State* v. *Espinosa*, 109 R.I. 221, 228, 283 A.2d 465 (1971) (state must establish voluntariness of confession by clear and convincing evidence).

the preponderance standard under state law."[17] *State v. James*, supra, 237 Conn. 419–20. Indeed, since *James* was decided, several states expressly have abandoned the minority rule and have concluded, for the reasons articulated in *Lego*, that the voluntariness of a confession need only be established by a preponderance of

---

[17] See *Ex parte Jackson*, 836 So. 2d 979, 982 (Ala.) (per curiam), cert. denied, 537 U.S. 1031, 123 S. Ct. 582, 154 L. Ed. 2d 448 (2002); *Beavers* v. *State*, 998 P.2d 1040, 1044 (Alaska 2000); *State* v. *Smith*, 193 Ariz. 452, 457, 974 P.2d 431, cert. denied, 528 U.S. 880, 120 S. Ct. 191, 145 L. Ed. 2d 161 (1999); *Pilcher* v. *State*, 355 Ark. 369, 376, 136 S.W.3d 766 (2003); *People* v. *Valdez*, 969 P.2d 208, 210 (Colo. 1998) (en banc); *DeJesus* v. *State*, 655 A.2d 1180, 1196 (Del. 1995); *McDole* v. *State*, 283 So. 2d 553, 554 (Fla. 1973); *Gulley* v. *State*, 271 Ga. 337, 339–40, 519 S.E.2d 655 (1999), cert. denied, 528 U.S. 1172, 120 S. Ct. 1199, 145 L. Ed. 2d 1102 (2000); *State* v. *Yager*, 139 Idaho 680, 685, 85 P.3d 656 (2004); *People* v. *Gilliam*, 172 Ill. 2d 484, 501, 670 N.E.2d 606 (1996), cert. denied, 520 U.S. 1105, 117 S. Ct. 1110, 137 L. Ed. 2d 311 (1997); *State* v. *Rank*, 214 N.W.2d 136, 138 (Iowa 1974); *State* v. *White*, 275 Kan. 580, 597, 67 P.3d 138 (2003); *Baynor* v. *State*, 355 Md. 726, 729 n.1, 736 A.2d 325 (1999); *People* v. *Conte*, 421 Mich. 704, 754–55, 365 N.W.2d 648 (1984); *State* v. *Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991); *State* v. *Olds*, 569 S.W.2d 745, 751 (Mo. 1978) (en banc); *State* v. *LaFrenier*, 163 Mont. 21, 27–28, 515 P.2d 76 (1973); *State* v. *Irwin*, 191 Neb. 169, 186, 214 N.W.2d 595 (1974); *Quiriconi* v. *State*, 96 Nev. 766, 772, 616 P.2d 1111 (1980); *State* v. *Fekete*, 120 N.M. 290, 298, 901 P.2d 708 (1995); *State* v. *Johnson*, 304 N.C. 680, 684–86, 285 S.E.2d 792 (1982); *State* v. *Thompson*, 256 N.W.2d 706, 709–10 (N.D. 1977); *State* v. *Arrington*, 14 Ohio App. 3d 111, 114, 470 N.E.2d 211 (1984); *Hawkins* v. *State*, 891 P.2d 586, 594 (Okla. 1994), cert. denied, 516 U.S. 977, 116 S. Ct. 480, 133 L. Ed. 2d 408 (1995); *State* v. *Stevens*, 311 Ore. 119, 137, 806 P.2d 92 (1991) (en banc); *Commonwealth* v. *Nester*, 551 Pa. 157, 163, 709 A.2d 879 (1998); *State* v. *Washington*, 296 S.C. 54, 56, 370 S.E.2d 611 (1988); *State* v. *Tuttle*, 650 N.W.2d 20, 30–31 (S.D. 2002); *State* v. *Stamper*, 863 S.W.2d 404, 405–406 (Tenn. 1993); *State* v. *Allen*, 839 P.2d 291, 300 (Utah 1992); *State* v. *Caron*, 155 Vt. 492, 501–503, 586 A.2d 1127 (1990); *Witt* v. *Commonwealth*, 215 Va. 670, 674, 212 S.E.2d 293 (1975); *State* v. *Braun*, 82 Wash. 2d 157, 162, 509 P.2d 742 (1973); *State* v. *Vance*, 162 W. Va. 467, 470–72, 250 S.E.2d 146 (1978); *State* v. *Agnello*, 226 Wis. 2d 164, 181–82, 593 N.W.2d 427 (1999); *Dodge* v. *State*, 562 P.2d 303, 308–309 (Wyo. 1977); see also *People* v. *Markham*, supra, 49 Cal. 3d 65, 71 (article I, § 28, subdivision [d] of California constitution requires voluntariness of confession to be established by preponderance of evidence); *Tabor* v. *Commonwealth*, 613 S.W.2d 133, 134 (Ky. 1981) (Kentucky Rule of Criminal Procedure 9.78 requires voluntariness of confession to be established by preponderance of evidence).

the evidence under state law. See *State* v. *Tuttle*, 650 N.W.2d 20, 30–31 (S.D. 2002); *State* v. *Agnello*, 226 Wis. 2d 164, 179–80, 182, 593 N.W.2d 427 (1999); see also *Tabor* v. *Commonwealth*, 613 S.W.2d 133, 134 (Ky. 1981) (Kentucky Rule of Criminal Procedure 9.78 requires voluntariness of confession to be established by preponderance of evidence); *State* v. *Washington*, 296 S.C. 54, 56, 370 S.E.2d 611 (1988) (clarifying that, although state must prove voluntariness of confession beyond reasonable doubt at trial, voluntariness need only be proven by preponderance of evidence at suppression hearing).

The defendant next claims that Connecticut's unique "legal history and common law require the state to prove that a confession was voluntary beyond a reasonable doubt." In support of this claim, the defendant relies on the same case law commentary by Swift and Blackstone as did the defendant in *James*. See footnote 12 of this opinion. For the reasons explained in *James*, "we do not read the common-law rule as applied in this state to have held the prosecution to an especially severe standard of proof . . . and, consequently, we agree with the state that it does not support the defendant's claim." (Citation omitted; internal quotation marks omitted.) *State* v. *James*, supra, 237 Conn. 419.

Lastly, the defendant and the amicus curiae Connecticut Criminal Defense Lawyers Association claim that the reasonable doubt standard is necessary both to protect adequately a criminal defendant's right to be free from self-incrimination, and to ensure the accuracy and reliability of a jury verdict based on confession evidence. In support of this claim, the amicus curiae relies on various sociological studies indicating that juries are unable to recognize and disregard false confessions. See, e.g., S. Drizin & R. Leo, "The Problem of False Confessions In the Post-DNA World," 82 N.C. L. Rev. 891, 962–63, 996 (2004); R. Leo & R. Ofshe, "The Consequences of False Confessions: Deprivations of

Liberty and Miscarriages of Justice in the Age of Psychological Interrogation," 88 J. Crim. L. & Criminology 429 (1998). Even assuming arguendo the validity of these studies,[18] we are not compelled to conclude that the public policy of this state requires the voluntariness of a confession to be proven beyond a reasonable doubt.

As a preliminary matter, we note that neither the defendant, the amicus curiae nor the dissenting opinion have pointed to a single case in which a defendant was convicted wrongfully in the state of Connecticut on the basis of false confession evidence. See footnote 3 of the dissenting opinion. Accordingly, we can perceive no reason to conclude that the existing procedural safeguards in this state against the admission of false confession evidence are inadequate, or that the juries of this state are unable to recognize and disregard false confessions.

Assuming arguendo, however, that the studies on which the amicus curiae and the dissenting opinion rely do not reflect isolated incidences in which justice was miscarried, but, rather, reflect a national trend concerning the undue weight afforded to false confession evidence by juries generally, we note that it is unclear what percentage, if any, of the false confessions identified in these studies were elicited by governmental coercion and, thus, were involuntary. Indeed, the studies establish that the "false confession problem is . . . not pandemic in the American criminal justice system, but rather concentrated among a narrow and vulnerable

---

[18] We note that the methodology employed in these studies and, therefore, the reliability of the conclusions drawn, has met with profound criticism in the academic community. See P. Cassell, "The Guilty and the 'Innocent': An Examination of Alleged Cases of Wrongful Conviction from False Confessions," 22 Harv. J. L. & Pub. Policy 523, 578, 583 (1999) (criticizing Leo and Ofshe's reliance on secondary sources to establish defendant's proven " 'innocence' " and noting that, of remaining proven false confession cases, all but one case involved individuals with serious mental illness).

population: persons with mental disabilities." P. Cassell, "The Guilty and the 'Innocent': An Examination of Alleged Cases of Wrongful Conviction from False Confessions," 22 Harv. J. L. & Pub. Policy 523, 526 (1999); see also S. Drizin & R. Leo, supra, 82 N.C. L. Rev. 963–74 (observing that false confessions are concentrated among following vulnerable populations: children, juveniles, mentally ill and mentally retarded). In light of the fact that a deficient mental condition alone is insufficient to render a confession involuntary, and that establishing involuntariness requires evidence of "police conduct, or official coercion, causally related to the confession"; (internal quotation marks omitted) *State v. Reynolds*, 264 Conn. 1, 54, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also *Colorado v. Connelly*, supra, 479 U.S. 165–66 (rejecting claim that mental deficiency alone is sufficient to establish involuntariness of confession; to conclude otherwise would expand "previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision"); these studies appear to belie, rather than support, the proposition that false confessions necessarily are obtained by coercive means.[19]

The dissenting opinion states that, "the significant role of false confessions in wrongful convictions necessarily implicates the voluntariness concern" because

---

[19] We note that a defendant's mental health bears upon his or her susceptibility to governmental coercion and, therefore, informs the voluntariness inquiry. See *Withrow v. Williams*, 507 U.S. 680, 693, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) ("Under the due process approach . . . courts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the *crucial element of police coercion* . . . [but also] the length of the interrogation . . . its location . . . the defendant's maturity . . . education . . . physical condition . . . and *mental health* . . . ." [Citations omitted; emphasis added.]).

"[w]hile the strong-arm tactics that often led to false confessions before the Supreme Court's decision effectively abolishing that practice in *Miranda* v. *Arizona*, supra, 384 U.S. 436, may no longer be prevalent, anecdotal evidence shows that the deceptive interrogation techniques currently employed by police interrogators are equally capable of coercing innocent suspects into false confessions."[20] It is well established, however, that although "some types of police trickery can entail coercion . . . trickery is not automatically coercion." *United States* v. *Byram*, 145 F.3d 405, 408 (1st Cir. 1998) (confession voluntary despite police assurances to defendant that "he was not implicated in [the victim's] death"). As we observed in *State* v. *Lapointe*, 237 Conn. 694, 732, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996), "statements by the police designed to lead a suspect to believe that the case against him is strong are common investigative techniques and would rarely, if ever, be sufficient to overbear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined . . . ." See id., 733 (police officer's "fabrication regarding the fingerprints on the knife handle did not

---

[20] The dissenting opinion also states that, "[t]his court would not be the first to increase protection of criminal defendants under its state constitution in light of recent evidence of wrongful convictions." See footnote 7 of the dissenting opinion. In support of this proposition, the dissenting opinion relies on *State* v. *Dubose*, 285 Wis. 2d 143, 162, 699 N.W.2d 582 (2005), wherein the Wisconsin Supreme Court concluded that its state constitution prohibits the admission of out-of-court eyewitness identifications procured through impermissibly suggestive procedures because "[t]he research strongly supports the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and [is] responsible for more wrongful convictions than all other causes combined." Given the Wisconsin Supreme Court's willingness to construe its state constitution in light of recent evidence of wrongful convictions, we find it significant that the court recently rejected the claim that its state constitution requires the voluntariness of a confession to be proven beyond a reasonable doubt. See *State* v. *Agnello*, supra, 226 Wis. 2d 180–82; see also footnote 15 of this opinion.

in any way compel the defendant to confess against his will to the sexual assault and murder of his wife's grandmother and the arson of her apartment"); see also *Frazier* v. *Cupp*, 394 U.S. 731, 737–39, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (confession voluntary even though obtained by police officer's false statement that coconspirator had confessed); *Green* v. *Scully*, 850 F.2d 894, 903–904 (2d Cir.) (confession voluntary despite false assurances by police of leniency and misrepresentations that there was sufficient evidence to support arrest), cert. denied, 488 U.S. 945, 109 S. Ct. 374, 102 L. Ed. 2d 363 (1988); 2 W. LaFave, J. Israel & N. King, Criminal Procedure (2d Ed. 1999) § 6.2 (c), p. 456 ("as a general matter it may be said that the courts have not deemed [police trickery and deception] sufficient by itself to make a confession involuntary").

For the reasons articulated in *James* and herein, we remain convinced that requiring the state to prove the voluntariness of a confession by a preponderance of the evidence, rather than by proof beyond a reasonable doubt, "strikes the appropriate balance, in light of our historical background and contemporary policy concerns, between the various interests at stake." (Internal quotation marks omitted.) *State* v. *James*, supra, 237 Conn. 425–26. Accordingly, we reject the defendant's invitation to overrule *James* and "to enshrine, as a constitutional mandate, the highest standard of proof for the preliminary determination of voluntariness." Id., 426.

## II

The defendant next claims that the trial court improperly instructed the jury on the presumption of innocence and the state's burden of proof in violation of the defendant's right to a fair trial under the due process clauses

of the federal and state constitutions.[21] Alternatively, the defendant claims that the trial court's jury instructions plainly were erroneous in light of the Appellate Court's disapproval of similar instructions in *State* v. *Wilson*, 71 Conn. App. 110, 120–21, 800 A.2d 653, cert. denied, 262 Conn. 905, 810 A.2d 272 (2002). Because the defendant did not preserve this claim in the trial court, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[22] or the plain error doctrine. We conclude that the defendant cannot prevail on this claim.

We begin with a review of the jury instruction at issue. After instructing the jury on, inter alia, the presumption of innocence, the state's burden of proof and the essential elements of the crimes charged, the trial

[21] The defendant has failed to provide an independent analysis of his state constitutional claim and, accordingly, we decline to review it. See *State* v. *Pierre*, 277 Conn. 42, 74 n.12, 890 A.2d 474 ("We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." [Internal quotation marks omitted.]), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[22] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) We review the defendant's claim under *Golding* because the record is adequate for our review and a claim of instructional impropriety regarding the presumption of innocence or the burden of proof is of constitutional magnitude. See, e.g., *State* v. *Betances*, 265 Conn. 493, 509, 828 A.2d 1248 (2003); *State* v. *Walton*, 227 Conn. 32, 64–65, 630 A.2d 990 (1993).

court issued the following instruction: "The defendant justly relies upon you to consider carefully his claims, to consider carefully all the evidence and to find him not guilty if the facts require such a verdict. The defendant rightly expects fair and just treatment from you. And at the same time the state of Connecticut and its people look to you to render a verdict of guilty if the facts and the law require such a verdict. *The state does not want the conviction of any person whose guilt upon the evidence there is a reasonable doubt.*" (Emphasis added.)

Our standard of review for claims of instructional impropriety is well established. "The principal function of a jury charge is to assist the jury in applying the law correctly to the facts which they might find to be established . . . . When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety . . . and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party . . . . In this inquiry we focus on the substance of the charge rather than the form of what was said not only in light of the entire charge, but also within the context of the entire trial. . . . Moreover, as to unpreserved claims of constitutional error in jury instructions, we have stated that under the third prong of *Golding*, [a] defendant may prevail . . . only if . . . it is reasonably possible that the jury was misled . . . ." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 864–65, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

The defendant claims that the trial court's instruction undermined the presumption of innocence and the state's burden of proof by "bolstering the credibility of both the state and the individual state's attorney who

prosecuted the defendant because it suggested to the jury that neither would have countenanced the bringing of charges against an innocent person . . . ." We disagree. In this case, as in previous cases discussing similar language, "[t]he court did not instruct that the state prosecutes only guilty people, but rather that the state requires the conviction of only the guilty." *State* v. *Allen*, 28 Conn. App. 81, 85, 611 A.2d 886, cert. denied, 223 Conn. 920, 614 A.2d 826 (1992); id., 84 (no reasonable possibility that jury was misled by trial court's instruction that " '[t]he state does not desire the conviction of innocent people or of any person whose guilt upon the evidence is in the realm of reasonable doubt' "). Moreover, throughout its final charge to the jury, the trial court repeatedly emphasized the presumption of innocence and the state's burden of establishing guilt beyond a reasonable doubt.[23] Accordingly, the defen-

---

[23] The trial court instructed the jury in relevant part as follows: "In this case, as in all criminal cases, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. The presumption of innocence was with this defendant when he was first presented for trial in this case. He must be considered free of any bias or prejudice of burden arising out of the fact that he has been arrested. This continues with him through this trial unless and until such time as all the evidence produced here in the orderly conduct of the case, considered in the light of these instructions of law and deliberated upon by you in the jury room, satisfies you beyond a reasonable doubt that he is guilty.

"Thus the presumption of innocence alone is sufficient to acquit the defendant unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all the evidence and facts in this case. If and when the presumption of innocence has been overcome by evidence proven beyond a reasonable doubt that the accused is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law and render such a verdict.

"Another general rule is the burden of proof. The burden to prove the defendant guilty of the crime or crimes with which he is charged is upon the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged."

Additionally, immediately following the challenged instruction, the trial court instructed the jury that, "[i]t is the sworn duty of the court and jurors to safeguard the right of persons charged with crimes by respecting the presumption of innocence which the law gives to every person so charged.

dant's claim fails under the third prong of *Golding* because there is no reasonable possibility that the jury was misled.[24] See *State* v. *Marshall*, 83 Conn. App. 418,

The law is made to protect society and persons whose guilt has not been established beyond a reasonable doubt and not to protect those whose guilt has been so established. If, when the presumption of innocence has been overcome by evidence proven beyond a reasonable doubt that the accused person is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law and to render a verdict of guilty.

"Now, when you go into the jury room to deliberate on the evidence in this case, you should ask yourself this question, am I convinced beyond a reasonable doubt of the guilt of this particular accused as charged in the information or the lesser included offenses, if you have reached them in your deliberations. If you are so convinced, you will convict him. But if you have a reasonable doubt as to his guilt, you will give him the benefit of that doubt and find him not guilty."

[24] We note that the trial court instructed the jury in relevant part that, "[t]he law is made to protect society and persons whose guilt has not been established beyond a reasonable doubt and not to protect those whose guilt has been so established." See footnote 23 of this opinion. In *State* v. *Schiappa*, 248 Conn. 132, 175, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999), we directed the trial courts to refrain from using a similar jury instruction because "when viewed in isolation, [it] gives rise to a danger of juror misunderstanding" concerning the presumption of innocence and the state's burden of proof. See id., 170–71 (instructing trial courts to discontinue use of following jury instruction concerning presumption of innocence: " '[b]ut you must keep in mind that this rule of law is made to protect the innocent and not the guilty' "). Although the defendant does not challenge the foregoing instruction in the present appeal, he claims that because this instruction was issued in conjunction with the challenged instruction, it reasonably is possible that the jury was misled. After reviewing the jury charge as a whole, we are convinced that the trial court adequately apprised the jury that the defendant was entitled to a presumption of innocence and that the state bore the burden of establishing guilt beyond a reasonable doubt. Cf. *State* v. *Smith*, 275 Conn. 205, 245 n.21, 881 A.2d 160 (2005) (no reasonable possibility that jury was misled by trial court's instruction that "[t]he law is made to protect society and persons whose guilt . . . has not been proven beyond a reasonable doubt and not to protect persons who have been proven guilty beyond a reasonable doubt"); *State* v. *Schiappa*, supra, 176–77 (no reasonable possibility that jury was misled). Accordingly, we reject the defendant's claim that "a combination of two challenged instructions becomes more than the sum of their individual parts and results in a dilution of the state's burden of proof." *State* v. *Torres*, 82 Conn. App. 823, 837, 847 A.2d 1022, cert. denied, 270 Conn. 909, 853 A.2d 525 (2004).

430, 850 A.2d 1066 (no reasonable possibility that jury was misled by trial court's instruction that " '[t]he state does not desire a conviction of an innocent person or any person whose guilt upon the evidence is in the realm of reasonable doubt . . . [and] [t]he state has as much concern in having an innocent person acquitted as in having a guilty person punished' "), cert. denied, 271 Conn. 904, 859 A.2d 564 (2004); *State* v. *Torres*, 82 Conn. App. 823, 835, 847 A.2d 1022 (no reasonable possibility that jury was misled by trial court's instruction that " '[t]he state, as well, does not want the conviction of an innocent person . . . [and] [t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted' "), cert. denied, 270 Conn. 909, 853 A.2d 525 (2004); *State* v. *Wilson*, supra, 71 Conn. App. 117–18, 121 (no reasonable possibility that jury was misled by trial court's instruction that " '[t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted' "); *State* v. *Tyson*, 43 Conn. App. 61, 68, 682 A.2d 536 (no reasonable possibility that jury was misled by trial court's instruction that " 'the state does not want the conviction of innocent persons' "), cert. denied, 239 Conn. 933, 683 A.2d 401 (1996).

The defendant next claims that the trial court committed plain error because it disregarded the Appellate Court's suggestion in *State* v. *Wilson*, supra, 71 Conn. App. 120–21,[25] that the use of a similar instruction

___

[25] In *Wilson*, the defendant claimed that the trial court's instruction to the jury that, " '[t]he state is as much concerned in having an innocent person acquitted as in having a guilty person convicted' "; *State* v. *Wilson*, supra, 71 Conn. App. 117–18; improperly "suggested that the state would not have pursued the prosecution unless it had a good faith basis for believing that the person charged was guilty, thereby diluting the state's burden of proof in that the instruction may result in the possibility that a juror . . . might be given to understand from it that only innocent persons should be acquitted." (Internal quotation marks omitted.) Id., 119. After reviewing the jury charge as a whole, the Appellate Court concluded that there was no reasonable possibility that the jury had been misled because the trial court "adequately informed the jury that it could draw no inference of the defendant's guilt

should be discontinued because the instruction possibly is susceptible of an unacceptable interpretation when viewed in isolation. "The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 526, 911 A.2d 712 (2006); see also Practice Book § 60-5. Even if we assume, arguendo, that the jury instruction at issue in this case, like the jury instruction at issue in *Wilson*, possibly is susceptible of an unacceptable interpretation when viewed in isolation, the instruction nevertheless was not offered in isolation. Indeed, as previously explained, the trial court's instructions, when viewed in their entirety, adequately informed the jury of the presumption of innocence and the state's burden of establishing guilt beyond a reasonable doubt. Accordingly, we are not convinced that the potential danger of misunderstanding "was so significant as to affect the fairness and integrity of or the public confidence in the proceeding, as required for reversal under the plain error doctrine."[26] *State* v. *Smith*, 275 Conn. 205, 246,

---

from the fact that she had been arrested and charged, and that the state had to prove beyond a reasonable doubt that the defendant committed the offenses with which she was charged." Id., 121.

[26] The defendant also claims that "institutional" concerns necessitate reversal of the trial court's judgment because "in order for [the Appellate Court's suggestion in *Wilson*] to have any real meaning, it must be enforced." We reject this claim. First, the defendant does not claim, and there is no evidence in the record to suggest, that the trial court intentionally disre-

881 A.2d 160 (2005) (trial court's contravention of direction in *State* v. *Schiappa*, 248 Conn. 132, 175, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 [1999], to discontinue use of challenged jury instruction did not merit reversal under plain error doctrine); see also *State* v. *O'Neil*, 67 Conn. App. 827, 837, 789 A.2d 531 (2002) (trial court's contravention of direction in *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 [1999], to discontinue use of challenged instruction did not merit reversal under plain error doctrine because "the instructions did not affect the fairness or integrity of the proceedings, nor did they result in a manifest injustice to the defendant").

The judgment is affirmed.

In this opinion NORCOTT, PALMER, VERTEFEUILLE, ZARELLA and GRUENDEL, Js., concurred.

PALMER, J., concurring. I agree with and join the majority opinion. For the reasons set forth therein, I am not persuaded that we should overrule our holding in *State* v. *James*, 237 Conn. 390, 425–26, 678 A.2d 1338 (1996), that, under the Connecticut constitution, a confession is admissible if the state has demonstrated the

---

garded the Appellate Court's suggestion in *Wilson*. Indeed, because the language of the instruction at issue in the present case is distinct from the language of the instruction at issue in *Wilson*; see footnote 25 of this opinion; it is difficult to perceive how the trial court could have disregarded the Appellate Court's suggestion intentionally and flagrantly. Second, as the defendant concedes, "a suggestion by the Appellate Court does not carry the same weight as an exercise of . . . supervisory authority" and, therefore, does not implicate the same institutional concerns. Lastly, and most importantly, we reject the defendant's contention that a per se rule of reversal is required under the plain error doctrine in the absence of manifest injustice in the trial court proceedings. Cf. *State* v. *D'Antonio*, 274 Conn. 658, 681, 877 A.2d 696 (2005) (rejecting per se rule of reversal for violation of prophylactic rule requiring judge to disqualify himself from trial if he previously had presided over plea negotiations).

voluntariness of the confession by a preponderance of the evidence.

I write separately only to underscore that, to the extent that false confessions have led to a number of wrongful convictions across the United States, our legislature is free to enact legislation requiring police to videotape confessions whenever it is reasonably feasible to do so. Although valid reasons may exist not to impose such a requirement on the police, there can be little doubt that recording confessions would dramatically reduce, if not eliminate, any possible likelihood of an erroneous conviction predicated on an involuntary confession. Indeed, videotaping confessions would greatly aid both the trial court and the jury in evaluating the voluntariness and, ultimately, the reliability of those confessions.

Moreover, as the dissent notes, it is apparent that the risk of a false confession is appreciably greater in cases of juveniles and persons with mental disabilities. Because children and mentally disabled persons are especially vulnerable to police overreaching—and because it appears that they also are more likely than others to confess falsely even in the absence of improper government coercion—videotaping confessions by such persons would serve an especially salutary purpose.

KATZ, J., dissenting. As expressed in my concurring opinion in *State* v. *James*, 237 Conn. 390, 439, 678 A.2d 1338 (1996) (concurring in result upon concluding that trial court determined that confession was voluntary beyond reasonable doubt), I remain convinced that article first, § 8, of the constitution of Connecticut[1] requires

---

[1] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions . . . [n]o person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

the state to prove beyond a reasonable doubt that a defendant's confession was voluntary before that confession may be admitted as evidence against the defendant at trial. Given the growing body of evidence that has come to light since *James* demonstrating the problem of erroneous convictions generally and false confessions specifically, I would use this opportunity to overrule this court's holding in *James* that "the preponderance standard provides a 'fair and workable test' . . . that strikes the appropriate balance . . . for the preliminary determination of voluntariness [of confessions]." (Citations omitted.) Id., 425–26. I believe that Connecticut should join the significant minority of states that have concluded that their state constitutions require that, in order to use a confession against a defendant, the state must prove beyond a reasonable doubt that the confession was "the product of an essentially free and unconstrained choice by its maker . . . ." *Culombe* v. *Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). Accordingly, I would reverse the judgment of the trial court and remand the case with direction to scrutinize the admissibility of the confession under a reasonable doubt standard.

I appreciate that the doctrine of stare decisis "cautions courts to tread lightly into the world of overruling precedent." *State* v. *Miranda*, 274 Conn. 727, 768, 878 A.2d 1118 (2005). This court has recognized that, "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *White* v. *Burns*, 213 Conn. 307, 335, 567 A.2d 1195 (1990). Nonetheless, "[t]he doctrine . . . is not . . . an inexorable command." *Lawrence* v. *Texas*, 539 U.S. 558, 577, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003); accord *Payne* v. *Tennessee*, 501 U.S. 808, 828, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) ("[s]tare decisis is not an inexorable command; rather, it is a principle of policy and not a

mechanical formula of adherence to the latest decision" [internal quotation marks omitted]). This court has recognized that "[t]he value of adhering to precedent is not an end in and of itself . . . if the precedent reflects substantive injustice. Consistency must also serve a justice related end. B. Cardozo, The Nature of the Judicial Process (1921) p. 150 (favoring rejection of precedent when it 'has been found to be inconsistent with the sense of justice or with the social welfare')." *Conway* v. *Wilton*, 238 Conn. 653, 659, 680 A.2d 242 (1996).

Indeed, it is well recognized that, in a "case involv[ing] an interpretation of the Constitution . . . claims of stare decisis are at their weakest . . . where [the court's] mistakes cannot be corrected by Congress." *Vieth* v. *Jubelirer*, 541 U.S. 267, 305, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004); see also *Payne* v. *Tennessee*, supra, 501 U.S. 828; *Burnet* v. *Coronado Oil & Gas Co.*, 285 U.S. 393, 406–10, 52 S. Ct. 443, 76 L. Ed. 815 (1932) (Brandeis, J., dissenting) ("[I]n cases involving the [f]ederal [c]onstitution, where correction through legislative action is practically impossible, this [c]ourt has often overruled its earlier decisions. *The [c]ourt bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function.* . . . The reasons why this [c]ourt should refuse to follow an earlier constitutional decision which it deems erroneous are particularly strong where the question presented is one of applying, as distinguished from what may accurately be called interpreting, the [c]onstitution. In the cases which now come before us there is seldom any dispute as to the interpretation of any provision. The controversy is usually over the application to existing conditions of some well-recognized constitutional limitation." [Citation omitted; emphasis added.]), overruled on other grounds by *Helvering* v. *Mountain Pro-*

*ducers Corp.*, 303 U.S. 376, 387, 58 S. Ct. 623, 82 L. Ed. 907 (1938). "In short, consistency must not be the only reason for deciding a case in a particular way, if to do so would be unjust. Consistency obtains its value best when it promotes a just decision." *Conway* v. *Wilton*, supra, 238 Conn. 662. " 'It is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations.' " *State* v. *Miranda*, supra, 274 Conn. 734, quoting *Barden* v. *Northern Pacific R. Co.*, 154 U.S. 288, 322, 14 S. Ct. 1030, 38 L. Ed. 992 (1894).

Recent studies demonstrating the significant role of admissions of involuntary and false confessions in wrongful convictions in this country provide compelling evidence that our conclusion in *James* as to the admissibility of confessions fails to promote just verdicts. Therefore, stare decisis should not control our decision in this case.

There is, for example, a considerable and growing body of anecdotal evidence regarding wrongful convictions that has been exposed through recent DNA exonerations. According to one authoritative source, as of April 12, 2007, 198 wrongfully convicted persons have been exonerated though the use of postconviction DNA testing in the United States. See http://innocenceproject.org/know (last visited April 12, 2007).[2] False confessions played a role in at least forty-one of those wrongful convictions. See R. Leo, S. Drizin & P. Neufeld et al., "Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century," 2006 Wis. L. Rev. 479, 516. DNA exonera-

---

[2] The Innocence Project is a national litigation and public policy organization that handles cases involving claims of actual innocence in which postconviction DNA testing can yield conclusive proof of innocence or guilt and, through exposure of the causes of wrongful conviction, seeks to initiate criminal justice reform. See http://innocenceproject.org (last visited April 12, 2007).

tions, however, represent only a fraction of the actual number of wrongful convictions in this country.[3]

Indeed, in a survey attempting to analyze all exonerations in the United States between 1989 and 2003, researchers uncovered a total of 340 exonerations, in which 144 of those wrongly convicted persons were exonerated by DNA evidence and 196 were exonerated by other means. See S. Gross, K. Jacoby & D. Matheson et al., "Exonerations in the United States 1989 through 2003," 95 J. Crim. L. & Criminology 523, 524 (Winter 2005).[4] In 51 of those 340 exonerations, the defendants had confessed falsely to crimes they did not commit. Id., 544. In 28 of the 51 false confessions, police coercion was apparent from the record. Id., 554 n.47. Although in 18 of the cases the record is unclear as to the motivation for the false confession, in only 5 instances did the confessions appear to have been given freely and voluntarily. Id. False confessions are most common among the most vulnerable groups of defendants—juveniles and people with mental disabilities. Id., 545; see

[3] See, e.g., S. Drizin & R. Leo, "The Problem of False Confessions in the Post-DNA World," 82 N.C. L. Rev. 891, 955–56 (2004). According to the data collected to date by the Innocence Project; see footnote 2 of this opinion; Connecticut has had two wrongfully convicted persons exonerated through DNA testing, neither of whom falsely confessed. See http://innocenceproject.org/Content/240.php (Mark Reid case profile) and http://innocenceproject.org/Content/272.php (James Tillman case profile). According to another survey, two additional criminal defendants in Connecticut also were exonerated of the crimes for which they had been convicted: Rickey Hammond was exonerated through DNA evidence in 1992; and Lawrence J. Miller, Jr., was exonerated through other means in 1997. See S. Gross, K. Jacoby & D. Matheson et al., "Exonerations in the United States 1989 through 2003," 95 J. Crim. L. & Criminology 523, 555 (Winter 2005). Disparities in such statistics are not uncommon, however, due to the difficulty in collecting comprehensive data from the various criminal justice institutions in the United States.

[4] Although the survey is the most comprehensive available for that time period, the authors caution that it should not be considered exhaustive due to the fragmentation of the United States criminal justice system. S. Gross, K. Jacoby & D. Matheson et al., supra, 95 J. Crim. L. & Criminology 525.

also R. Leo, S. Drizin & P. Neufeld et al., supra, 2006 Wis. L. Rev. 512 (concluding that DNA evidence has revealed that false confessions are leading cause of wrongful convictions, citing B. Scheck, P. Neufeld & J. Dwyer, Actual Innocence [2000] p. 92); R. Leo & R. Ofshe, "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogations," 88 J. Crim. L. & Criminology 429 (1998); P. Cassell, "The Guilty and the 'Innocent': An Examination of Alleged Cases of Wrongful Conviction from False Confessions," 22 Harv. J. L. & Pub. Policy 523, 526 (1999) (criticizing Leo and Ofshe study, but admitting that "false confession problem is . . . concentrated among a narrow and vulnerable population: persons with mental disabilities").

In a 2003 study of wrongful homicide convictions in Illinois, which, like Connecticut, uses a preponderance voluntariness standard for admission of confessions, it was found that twenty-five out of forty-two wrongful murder convictions since 1970 were based on false confessions, fourteen of those cases involved confessions by the defendants themselves and eleven cases involved confessions principally by codefendants. R. Warden, "The Role of False Confessions in Illinois Wrongful Murder Convictions Since 1970," Center on Wrongful Convictions, at http://www.law.northwestern. edu/depts/clinic/wrongful/FalseConfessions2.htm (last modified March 8, 2004). A 2004 study analyzed 125 "interrogation-induced false confessions that can be classified as 'proven'—that is, confessions that are indisputably false because at least one piece of dispositive evidence objectively establishes, beyond any doubt, that the confessor could not possibly have been the perpetrator of the crime." S. Drizin & R. Leo, "The Problem of False Confessions in the Post-DNA World," 82 N.C. L. Rev. 891, 925 (2004).[5] Ten of these 125 people were arrested but never charged, seventy-one were

---

[5] The authors explain that their study included confessions that were proven false in four dispositive situations: when a person confessed to a

unsuccessfully prosecuted, and forty-four were convicted of crimes they did not commit.[6] Id., 953.

Given this overwhelming evidence regarding the acute problem of false confessions, I believe that we must reexamine whether the Connecticut constitution requires the state to prove the voluntariness of a defendant's confession beyond a reasonable doubt.[7] It is settled that, under the federal constitution, the voluntar-

crime that did not occur; when it was proven that it was physically impossible for the suspect to commit the crime; when the true perpetrator was found and his or her guilt objectively established; and when scientific evidence, most commonly DNA evidence, established the false confessor's innocence. S. Drizin & R. Leo, supra, 82 N.C. L. Rev. 925–26.

[6] As compelling as the wrongful conviction statistic is, the authors of the 2004 survey note: "[V]irtually all false confessions result in some deprivation of the false confessor's liberty. Some scholars have focused only on false confession cases leading to wrongful conviction, but this neglects the amount of harm the system imposes on those who are not convicted. Individuals who are coerced into falsely confessing but ultimately not convicted may still lose their freedom for extended periods of time and suffer a number of other significant corollary harms as well: the stigma of criminal accusation (particularly if the person has falsely confessed to serious crimes such as murder or rape), the ongoing damage to their personal and professional reputation (even if charges are dropped or the innocent defendant is eventually acquitted), loss of income, savings, a job or career (sometimes resulting in bankruptcy), and the emotional strain of being apart from one's friends and family (which sometimes results in marital separation or divorce). To those innocents who suffer these unjust fates, the assertion by some scholars that only false confessions leading to wrongful convictions should count for scholarly inquiry or public policy reform or that only false confessions leading to wrongful convictions impose any meaningful harm is obviously misguided and myopic, if not downright cruel." S. Drizin & R. Leo, supra, 82 N.C. L. Rev. 949–50.

[7] This court would not be the first to increase protection of criminal defendants under its state constitution in light of recent evidence of wrongful convictions. The Wisconsin Supreme Court revised and sharpened its rule for admission of impermissibly suggestive out-of-court identifications in light of recent evidence it found "impossible . . . to ignore . . . strongly support[ing] the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States . . . ." State v. Dubose, 285 Wis. 2d 143, 162, 699 N.W.2d 582 (2005). The court recognized that its current approach to evaluating eyewitness identification had "significant flaws"; id., 163; chiefly because studies had shown that "it is extremely difficult, if not impossible, for courts to distinguish between identifications that were reliable and identifications that were unreliable." Id., 164.

iness of a confession is determined under the preponderance of the evidence standard. See *Lego* v. *Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972). In *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992), this court noted that, although "[w]e have frequently relied upon decisions of the United States Supreme Court interpreting the . . . United States constitution . . . to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution . . . [w]e have also, however, determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." (Internal quotation marks omitted.) Therefore, we decided, "[i]n order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the textual approach . . . (2) holdings and dicta of this court, and the Appellate Court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Citations omitted.) Id., 684–85.

I acknowledge that, strictly speaking, several of these factors weigh in favor of adhering to the federal constitutional standard. In my view, however, a reexamination of the factual and legal underpinnings of the federal precedent and this court's decision in *James*, read in light of the sixth *Geisler* factor, demands that we adopt the reasonable doubt standard under our state constitution. Accordingly, I begin with a discussion of the reasoning of the cases from which the preponderance standard eventually emerged.

In analyzing this issue, it is important to begin with the rationale underlying the utilization of the reasonable doubt standard. In *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), the Supreme Court underscored the well settled standard for the burden of proof in criminal cases: "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In his concurring opinion in *In re Winship*, Justice Harlan expounded on the basis for the distinction between the standards of proof in civil and criminal trials. "Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes [factually erroneous convictions and factually erroneous acquittals], the choice of the standard to be applied in a particular kind of litigation should . . . reflect an assessment of the comparative social disutility of each. When one makes such an assessment, the reason for different standards of proof in civil as opposed to criminal litigation becomes apparent. In a civil suit . . . we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor. A preponderance of the evidence standard therefore seems peculiarly appropriate for . . . it simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence. In a criminal case, on the other hand, we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty. . . . In this context, I view the requirement of proof beyond a reasonable doubt in a criminal

case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." (Citation omitted; internal quotation marks omitted.) Id., 371–72 (Harlan, J., concurring). In light of the recent exposure of the systemic problem of wrongful convictions in our criminal justice system, the importance of protecting this "fundamental value determination" is stronger than ever.

In 1964, the United States Supreme Court declared: "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . and even though there is ample evidence aside from the confession to support the conviction. . . . Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." (Citations omitted.) *Jackson* v. *Denno*, 378 U.S. 368, 376–77, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The court continued: "It is now inescapably clear that the [f]ourteenth [a]mendment forbids the use of involuntary confessions *not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive,* but also because of the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will . . . and because of the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals

themselves." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 385–86. These moral judgments expressed in the *In re Winship* and *Jackson* opinions constitute the foundation of the constitutional right against self-incrimination as well as the right to due process of law.

In *Lego* v. *Twomey*, supra, 404 U.S. 477, the Supreme Court considered which burden of proof should be applied in the determination of the voluntariness of confessions.[8] Unlike the *Jackson* court, the *Lego* court rejected the notion that the purpose of a voluntariness hearing was to enhance the reliability of jury verdicts. Id., 486. Although the court noted that it had acknowledged in *Jackson* that "coerced confessions are forbidden in part because of their 'probable unreliability' "; id., 484 n.12; it remarked that the "sole issue in [a voluntariness] hearing is whether a confession was coerced. Whether it be true or false is irrelevant; indeed, such an inquiry is forbidden." Id., 484–85 n.12. This is because "due process forbids the use of coerced confessions, whether or not reliable." Id., 485 n.13. Because it concluded that the purpose of excluding coerced confessions was unrelated to improving the reliability of jury verdicts,[9] the *Lego* court rejected the notion that admis-

[8] Although *Lego* was the first case in which the Supreme Court explicitly addressed the standard of proof necessary for admission of confessions, notably, in *Bram* v. *United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897), one of the first cases in which the court addressed the issue of admissibility of confessions, the court appeared to assume that reasonable doubt was the proper standard of proof of voluntariness: "In the case before us we find that an influence was exerted, and *as any doubt as to whether the confession was voluntary must be determined in favor of the accused,* we cannot escape the conclusion that error was committed by the trial court in admitting the confession under the circumstances disclosed by the record." (Emphasis added.) Id., 565.

[9] Although this conclusion properly states the position of the Supreme Court today, it was not always so. The earliest decisions addressing admissibility of out-of-court confessions under the fifth amendment; *Bram* v. *United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897); and constitutional due process requirements; *Brown* v. *Mississippi*, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682 (1936); structured their rationales at least in part in terms

sibility of a confession proven voluntary by a preponderance of the evidence undermined the mandate in *In re Winship*, which, the court reasoned, requires proof beyond a reasonable doubt only of the essential elements of the charged crime. Id., 486.

The *Lego* court did not end its inquiry there. The court addressed a second contention, "that evidence offered against a defendant at a criminal trial and challenged on constitutional grounds must be determined admissible beyond a reasonable doubt in order to give adequate protection to those values that exclusionary rules are designed to serve." Id., 487. The court acknowledged its decisions in *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (excluding confessions acquired though custodial interrogations unless adequate warnings were administered and waiver of rights obtained), *Weeks* v. *United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914) (rendering

of reliability. Accord *Spano* v. *New York*, 360 U.S. 315, 320–21, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959) ("The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."). Commentators have explained that, "[i]nitially, the dominant and preferred rationale was to promote reliability in the trial process by excluding confessions that were the product of police coercion or improper influence because they were likely to be false or untrustworthy. However, the 1930s and 1940s saw the ascendance of another idea—that courts should only admit confessions into evidence that were the product of a free and independent will. A third but subordinate rationale underlying the voluntariness test was that confessions elicited through fundamentally unfair police methods should be excluded so as to deter offensive police behavior, regardless of whether the suspect confessed involuntarily or his statements were likely to be trustworthy. These underlying purposes—reliability, protecting free will, and fundamental fairness—roughly correspond to the three goals of the adversary system: promoting truth-finding, protecting individual rights, and checking state power." R. Leo, S. Drizin & P. Neufeld et al., supra, 2006 Wis. L. Rev. 494; see generally id., 488–501 (thorough explanation of development of voluntariness doctrine).

impermissible admission of evidence obtained in violation of defendant's fourth amendment rights), and *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (extending fourth amendment protections to actions by state actors), and noted that in these cases evidence was kept from the jury, regardless of its probative value, for reasons other than ensuring the reliability of verdicts. *Lego* v. *Twomey*, supra, 404 U.S. 487–88. The court, however, rejected the petitioner's argument that the values underlying the exclusionary rule—protection of fundamental rights and deterrence of police misconduct—demanded a higher standard of proof in determining admissibility of confessions. Id., 488–89.

In rejecting this claim, the *Lego* court explained: "[F]rom our experience [with the exclusionary rule] . . . no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence. [The] [p]etitioner offers nothing to suggest that admissibility rulings have been unreliable or otherwise wanting in quality because not based on some higher standard. Without good cause, we are unwilling to expand currently applicable exclusionary rules by erecting additional barriers to placing *truthful and probative evidence* before state juries and by revising the standards applicable in collateral proceedings. Sound reason for moving further in this direction has not been offered here nor do we discern any at the present time. This is particularly true since the exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in [f]ourth and [f]ifth [a]mendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing *probative evidence* before juries for the purpose of arriving at truthful decisions about guilt or innocence." (Emphasis added.) Id. Thus, even while rejecting the

idea that the admissibility test should in part be concerned with trustworthiness, the court noted the probative value of confession evidence at trial and assumed that admitted confessions were "truthful . . . ." Id., 489. Moreover, although the petitioner in *Lego* may not have been able to produce evidence that "admissibility rulings [had] been unreliable or otherwise wanting in quality"; id., 488; the flood of evidence collected by scholars and researchers regarding false confessions impacting wrongful convictions since *Lego* was decided demonstrably undermines the propriety of the preponderance standard. Notably, after concluding that preponderance of the evidence was the proper burden for the state to sustain in proving voluntariness, the court took the unusual step of adding, "[o]f course, the [s]tates are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." Id., 489.

The Supreme Court decided *Lego* in 1972, long before the use of DNA testing exposed the significant problem of wrongful conviction in the criminal justice system. In light of the substantial evidence uncovered regarding the considerable role of false confessions in this alarming and widespread phenomenon, it is reasonable to imagine that the *Lego* court would come to a different conclusion today. At the very least, the court would have to acknowledge and reconcile the evidence that we currently confront. Certainly, there is a distinction to be made between involuntary confessions and false confessions. The *Lego* court explicated that distinction thoroughly in its decision. See id., 482–87. As the court also recognized, however, the two issues are closely related. If the primary purpose of the voluntariness determination is to evaluate whether a defendant confessed of his or her own volition and to exclude all confessions that are involuntary, both true and false involuntary confessions would be identified as inadmis-

sible. All involuntary confessions are equally abhorrent to our criminal law. The anecdotal evidence of the significant role of false confessions in wrongful convictions necessarily implicates the voluntariness concern. While the strong-arm tactics that often led to false confessions before the Supreme Court's decision effectively abolishing that practice in *Miranda* v. *Arizona*, supra, 384 U.S. 436, may no longer be prevalent, anecdotal evidence shows that the deceptive interrogation techniques currently employed by police interrogators are equally capable of coercing innocent suspects into false confessions.[10]

As discussed previously in this dissent and reiterated by the majority in its opinion, this court has stated unequivocally that the constitutional standard in this state for determining the voluntariness of a confession is preponderance of the evidence. See *State* v. *James*, supra, 237 Conn. 425–26; see also p. 158 of the majority opinion. The majority remains steadfastly loyal to this

---

[10] See M. Gohara, "A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques," 33 Fordham Urb. L. J. 791, 816 (March 2006) ("A number of critiques of the leading interrogation techniques . . . described the reasons that the use of deception and trickery during interrogations leads to false confessions. Most of these critiques describe the kinds of cost/benefit analyses suspects undertake before deciding to incriminate themselves, regardless of guilt or innocence. The critiques and related theories help illustrate the impact trickery and deception, particularly an exaggeration or misrepresentation of the existence or quantum of independent incriminating evidence, have on even innocent suspects."); R. Ofshe & R. Leo, "The Decision to Confess Falsely: Rational Choice and Irrational Action," 74 Denv. U. L. Rev. 979, 985 (1997) ("Psychological interrogation is effective at eliciting confessions because of a fundamental fact of human decision-making—people make optimizing choices given the alternatives they consider. Psychologically-based interrogation works effectively by controlling the alternatives a person considers and by influencing how these alternatives are understood. The techniques interrogators use have been selected to limit a person's attention to certain issues, to manipulate his perceptions of his present situation, and to bias his evaluation of the choices before him. The techniques used to accomplish these manipulations are so effective that if misused they can result in decisions to confess from the guilty and innocent alike.").

court's reasoning in *James*. In light of the previous discussion of erroneous convictions based on false confessions, however, I cannot join in that unflinching adherence, and I instead utilize this opportunity to revisit some of the reasoning of the *James* decision in favor of the preponderance standard. Citing *State* v. *Staples*, 175 Conn. 398, 406, 399 A.2d 1269 (1978), the *James* court noted, "that there was not substantial evidence that voluntariness determinations governed by the preponderance standard were *unreliable* or would result in derogations of a criminal defendant's constitutional rights, [and] concluded that '[w]e have been given no valid reason why proof by [the preponderance] standard, with a judge making a positive finding on voluntariness, does not provide a fair and workable test which affords a criminal defendant those rights guaranteed him by both the United States and Connecticut constitution[s].' " (Emphasis added.) *State* v. *James*, supra, 413. Thus, even as the *James* court considered "unjustified" the assumption that the purpose of a voluntariness hearing was to "enhance the reliability of jury verdicts"; id., 412; immediately thereafter, it claimed that there was no proof offered to show that determinations under the preponderance standard were unreliable, undermining its previous claim that admissibility of confessions was unrelated to reliability. Id., 412–13. The majority cites with approval the *James* court's iteration of the Supreme Court's conclusion in *Lego* that a voluntariness determination is not intended to ensure the ultimate reliability of a jury's verdict, but adds that "[w]ithout retreating from that position . . . we acknowledged [in *State* v. *James*, supra, 421–22] that, 'the concern that coercion provides a reason to confess falsely is, nevertheless, a long-standing ground for not receiving coerced confessions into evidence, which is reflected in our common law precedent. Thus, to the extent that there may be a correlation between involuntariness and

falsity, this is a relevant consideration.' " See p. 166 of the majority opinion. This solipsistic reasoning seems to me a distinction without a difference. Either reliability is a concern in voluntariness determinations or it is not. It is irresponsible for this court to espouse a standard based on the rationale that a determination of voluntariness is divorced from any concern of coercion, and then in the next breath acknowledge, almost parenthetically, that "to the extent" they are related, this is, in fact, "a relevant consideration." *State* v. *James*, supra, 422.

In light of the copious evidence of wrongful convictions and admission of false confessions in this country, the claim that admission of confessions should be divorced from any consideration of reliability is, at a minimum, socially irresponsible. Undeniably, many unreliable confessions have been admitted for consideration by triers of fact. The majority's reiteration of the *James* court's affirmation of its "confidence in the ability of juries to discern the proper weight to be afforded to conflicting evidence" regarding whether to credit a confession "and if so, whether it is sufficient with other evidence to demonstrate guilt beyond a reasonable doubt]"; id., 424; see p. 169 of the majority opinion; plainly has been discredited by several scholarly studies conducted subsequent to that case. Statistics have shown not only that juries are unable to identify false confessions, but that they regularly base their verdicts on such confessions despite other evidence pointing to innocence.

One recent study demonstrated that in a sample of thirty proven false confession cases, 73 percent of the defendants were convicted even in the absence of any physical or other significant credible evidence to corroborate the confession. See R. Leo & R. Ofshe, supra,

88 J. Crim. L. & Criminology 481–82;[11] see also S. Drizin & R. Leo, supra, 82 N.C. L. Rev. 960 (in study of 125 proven false confession cases, 81 percent of those defendants who went to trial were convicted by juries even though their confessions were later proven false). Mock jury studies have shown that confession evidence has greater impact than eyewitness testimony, character testimony and other forms of evidence. See S. Kassin & K. Neumann, "On the Power of Confession Evidence: An Experimental Test of the 'Fundamental Difference' Hypothesis," 21 Law & Hum. Behav. 469 (1997). These studies demonstrate that jurors are unable to detect false confessions because of the commonsense expectation of self-serving behavior in others

---

[11] The majority cites an article in which one scholar criticizes the methodology of the study by Leo and Ofshe that formed the basis for this article. See P. Cassell, supra, 22 Harv. J. L. & Pub. Policy 526. Cassell's main criticism of Leo and Ofshe is their reliance on secondary sources for factual information underpinning the claims of innocence in some of their case studies. See id., 525, 580. In support of his claim that "[e]ven among the fifteen 'proven' cases of wrongful conviction from false confession [cited in the Leo and Ofshe article], many are disputed"; id., 581; however, Cassell cites the opinions of the prosecutors, district attorneys, and state police who worked on these cases that those people whom they helped to prosecute were in fact guilty, despite the fact that two of those people were officially exonerated by DNA evidence. Id., 581–82. Though there may be dispute about the accuracy of the media in reporting details of crimes, it hardly can be argued that those people with a personal stake in winning convictions are less biased than the members of the media. For example, Steven Linscott had his conviction overturned twice before prosecutors submitted biological evidence to DNA testing that proved conclusively that he could not have been the source of the seminal fluid in the murder for which he was convicted, leading the prosecutors to decline to try him a third time. See http://www.innocenceproject.org/Content/200.php. Earl Washington, who has an I.Q. of approximately sixty-nine and was questioned by police for two days before producing "confessions" to five different crimes, four of which were dismissed by the commonwealth of Virginia as being unreliable, eventually conclusively was excluded as the source of the seminal fluid in the capital murder for which he was convicted (based on the fifth "confession"), and received an absolute pardon from the governor of Virginia. See http://innocenceproject.org/Content/282.php. It is, therefore, difficult to imagine how the belief of the prosecutors in those cases that these men are in fact guilty has *any* bearing on their actual innocence.

and the accompanying disinclination to believe that a person would falsely confess. S. Kassin & G. Gudjonsson, "The Psychology of Confessions: A Review of the Literature and Issues," 5 Psychol. Sci. in Pub. Int. 33, 56 (November 2004); see also S. Kassin & H. Sukel, "Coerced Confessions and the Jury: An Experimental Test of the 'Harmless Error' Rule," 21 Law & Hum. Behav. 27, 44 (1997) (mock jury study demonstrated that false confession increased conviction rate even when jury recognized it as coerced, court ruled it inadmissible and jurors claimed it did not affect verdict).

In its focus on " 'any incremental gains to be realized from imposing the higher reasonable doubt standard,' " the majority states that it believes that, in " 'the trial court's resolution of conflicting testimony by police and the accused . . . it is only in rare cases that the trial court might be convinced by a preponderance of the evidence that a confession is voluntary but nevertheless harbor a reasonable doubt about the same.' " See p. 167 of the majority opinion, quoting *State* v. *James*, supra, 237 Conn. 423. Indeed, the facts of the present case would appear to exemplify a scenario in which the trial court very well might have been convinced that the confession by the defendant, David Lawrence, was more likely than not voluntary, and yet still have harbored a reasonable doubt as to its voluntariness. The defendant testified that, while he was being interrogated alone in his bedroom by Detective Michael Goggin of the Waterbury police department, Goggin threatened to have the department of children and families remove the defendant's children if he did not admit to possession of the drugs found in his home. Although other police officers testified that Goggin did not threaten the defendant, they were not in the room at the time of the interrogation, and it is not surprising that Goggin did not admit that he threatened the defendant when he testified at the probable cause hearing. While I make

no assumptions about the internal deliberations of the trial court on this issue, it is far from inconceivable that the facts presented to the court regarding the voluntariness deliberation could have raised a reasonable doubt in the court's mind.

Justice Brennan was all too accurate when he stated that "[t]riers of fact accord confessions such heavy weight in their determinations that the introduction of a confession makes the other aspects of a trial in court superfluous . . . ." (Internal quotation marks omitted.) *Colorado* v. *Connelly*, 479 U.S. 157, 182, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (Brennan, J., dissenting). As the Supreme Court recognized in *Arizona* v. *Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), "[a] confession is like no other evidence." Thus, the *James* court's contention, reiterated with approval by the majority in its opinion, that the defendant is free "to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness"; (internal quotation marks omitted) *State* v. *James*, supra, 237 Conn. 425; see pp. 168–69 of the majority opinion; is unavailing. Although the jury must decide whether to credit a confession and must weigh whether the other evidence adduced at trial is in accordance with the confession or demands acquittal, as discussed previously, experience shows that a jury's ability to evaluate that evidence is biased dramatically by the introduction of a confession, no matter how incredible it appears in light of other evidence. Requiring the state to prove the voluntariness of a confession beyond a reasonable doubt before it is submitted to the jury increases the chances that, when a jury does consider a confession, that confession will be reliable and voluntary. There is simply no reason not to utilize every opportunity our legal system affords to ensure the accuracy of jury verdicts and avoid wrongful convictions.

This court has, on more than one occasion, decided that the Connecticut constitution provides greater protection of its citizens than that mandated by the United States constitution.[12] Our reasoning for doing so in *State v. Marsala*, 216 Conn. 150, 579 A.2d 58 (1990), is instructive. In *Marsala*, we rejected the good faith exception to the exclusionary rule adopted by the United States Supreme Court in *United States* v. *Leon*, 468 U.S. 897, 920–21, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), and *Massachusetts* v. *Sheppard*, 468 U.S. 981, 987–88, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984). *State* v. *Marsala*, supra, 171. We determined that, "[a]lthough we recognize that the exclusionary rule exacts a certain 'cost' from society in the form of the suppression of relevant evidence in criminal trials, we conclude, nevertheless, that this 'cost' is not sufficiently 'substantial' to over-

---

[12] See, e.g., *State* v. *Reynolds*, 264 Conn. 1, 47, 836 A.2d 224 (2003) (rejecting federal constitutional requirement that, for seizure to occur, there must be submission by defendant to assertion of authority or use of force by police), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Morales*, 232 Conn. 707, 726–27, 657 A.2d 585 (1995) (criminal defendant need not prove bad faith of police in failing to preserve potentially exculpatory evidence in order to prevail on due process claim); *State* v. *Linares*, 232 Conn. 345, 379–86, 655 A.2d 737 (1995) (rejecting federal forum test under state constitution and adopting compatibility test that affords greater speech protection); *State* v. *Miller*, 227 Conn. 363, 386–87, 630 A.2d 1315 (1993) (warrantless automobile search supported by probable cause but conducted after vehicle has been towed to impound lot violates state constitution); *State* v. *Oquendo*, 223 Conn. 635, 652, 613 A.2d 1300 (1992) (declining to follow Supreme Court and distinguish between common-law distinction of arrest and attempted arrest when determining whether defendant was seized for purposes of state constitution); *State* v. *Geisler*, supra, 222 Conn. 690 (declining to follow federal rule and deciding that evidence obtained from illegal entry into home must be excluded unless taint of illegality attenuated by passage of time or intervening circumstances); *State* v. *Stoddard*, 206 Conn. 157, 166–67, 537 A.2d 446 (1988) (adopting rule requiring police promptly to inform suspects of their attorneys' attempts to provide legal assistance during interrogation, despite Supreme Court's rejection of such rule); *State* v. *Kimbro*, 197 Conn. 219, 233, 496 A.2d 498 (1985) (state constitution provides greater substantive protection to citizens than fourth amendment in determining probable cause), overruled in part on other grounds by *State* v. *Barton*, 219 Conn. 529, 544, 594 A.2d 917 (1991).

come the benefits to be gained by our disavowal of the *Leon* court's good faith exception to the exclusionary rule." Id., 165.

In the context of this case, the cost of the higher burden of proof does not outweigh the benefit to society. Although some voluntary and reliable confessions may be barred from introduction when there is doubt about their voluntariness, the overall effect will be to hold police officers and prosecutors to the highest standard when prosecuting their cases for the state. It is difficult to fathom the argument against assuring the protection of our citizens from unduly coercive police tactics in interrogation,[13] especially if we are concerned with protecting the innocent from unwarranted prosecution. In that vein, we acknowledged in *Marsala* our "willingness in other areas of the law to uphold the exclusion of concededly reliable and relevant evidence on the basis of some greater benefit that will be realized by its suppression." Id. The present case presents an ideal opportunity to exercise that willingness to exclude for the greater benefit of ensuring the reliability of evidence before the jury.

Under the fourth prong of the *Geisler* analysis, we examine the approach of our sister states for guidance. While it is true that a majority of states follow the federal preponderance standard, a significant minority have chosen to require greater protection for criminal defendants under their state constitutions and utilize the reasonable doubt standard. In *Commonwealth* v. *Tavares*, 385 Mass. 140, 430 N.E.2d 1198, cert. denied, 457 U.S. 1137, 102 S. Ct. 2967, 73 L. Ed. 2d 1356 (1982), the Massachusetts Supreme Judicial Court explained its rationale for requiring a judge to find a confession

---

[13] Indeed, legal scholars have argued against the efficacy and constitutionality of current police interrogation tactics, urging reform in this area. See generally M. Gohara, supra, 33 Fordham Urb. L.J. 791 (2006); R. Leo, S. Drizin & P. Neufeld et al., supra, 2006 Wis. L. Rev. 479.

voluntary beyond a reasonable doubt before submitting it to the jury for consideration. "Under our 'humane practice' the initial screening by the judge is the 'basic determination safeguarding the accused.' . . . [A] defendant's statement is usually 'the key item in the proof of guilt, and certainly one of overpowering weight with the jury.' " (Citations omitted.) Id., 152. Recently, the Supreme Judicial Court of Maine refused to overrule its long-standing policy requiring proof beyond a reasonable doubt of voluntariness, even though the court acknowledged that this standard went beyond what was required of it under the federal constitution, reaffirming that state public policy required the most stringent test. "[T]o confirm and preserve the value reflected in the constitutional privilege against self-incrimination we must minimize the risks of allowing legal effectiveness to non-voluntary, or involuntary, testimonial self-condemnation even at the expense of producing a loss of evidence which might have probative value; such was the price that our society had chosen to pay when it conferred constitutional protection upon the privilege against self-incrimination." (Internal quotation marks omitted.) *State* v. *Rees*, 748 A.2d 976, 979 (Me. 2000), quoting *State* v. *Collins*, 297 A.2d 620, 627 (Me. 1972). The New Hampshire Supreme Court also determined that the federal standard was not sufficiently protective of its citizens' rights. "The preponderance test does not provide a sufficient safeguard against [the] danger [of admitting involuntary confessions]. The adoption of the preponderance standard would amount to a determination that it is no more serious for an involuntary confession to be admitted than it is for a voluntary one to be excluded. . . . A confession is a special type of evidence. Its acceptance basically amounts to conviction. Confessions are usually obtained in the psychological atmosphere of police custody and in the greatest secrecy in which the cards can be stacked against the

accused. He has no means of combating the evidence produced by the police save by his own testimony. The stakes are too high and the risk of error too great to permit a determination of admissibility to be decided by a balance of probabilities." (Citations omitted.) *State v. Phinney*, 117 N.H. 145, 147, 370 A.2d 1153 (1977).

In addition, Indiana, Louisiana, Mississippi, New Jersey and New York all utilize the reasonable doubt standard of proof for voluntariness. See, e.g., *Pruitt v. State*, 834 N.E.2d 90, 114 (Ind. 2005), cert. denied, 548 U.S. 910, 126 S. Ct. 2936, 165 L. Ed. 2d 962 (2006); *State v. Vernon*, 385 So. 2d 200, 204 (La. 1980); *Moore v. State*, 858 So. 2d 190, 194 (Miss. App. 2003); *State v. Yough*, 49 N.J. 587, 595, 231 A.2d 598 (1967); *People v. Witherspoon*, 66 N.Y.2d 973, 974, 489 N.E.2d 758, 498 N.Y.S.2d 789 (1985). Maryland and South Carolina require a judge to make a pretrial finding of voluntariness by a preponderance of the evidence, but require the jury to find voluntariness beyond a reasonable doubt before considering it as evidence against the accused. See, e.g., *Baynor v. State*, 355 Md. 726, 729 n.1, 736 A.2d 325 (1999); *State v. Washington*, 296 S.C. 54, 56, 370 S.E.2d 611 (1988). These states all have determined that their state constitutions mandate proof of voluntariness by the highest legal standard before a confession may be used as evidence against an accused person.[14] Although they represent a minority, it is a significant minority consisting of a wide geographical and political range. Thus, any misgiving that the reasonable doubt standard is unworkable is refuted by the states that have been utilizing it for decades. Connecticut should seize this opportunity to afford its citizens this basic protection.

Although I am unaware of studies examining the connection between the admission of false confessions and

---

[14] Rhode Island has determined that its state constitution requires a heightened proof, clear and convincing evidence. See, e.g., *State v. Forbes*, 900 A.2d 1114, 1118 (R.I. 2006).

the requisite burden of proof for admissibility, I believe it is safe to assume that raising the burden of proof decreases the chance of admitting both a coerced false confession and a coerced true confession, either of which, according to the United States Supreme Court and this court, is equally offensive to constitutional due process rights. As noted previously, studies have been conducted, however, examining the persuasive power of confessions, even when much if not all of the additional evidence points to the defendant's innocence. These studies show the vast disproportionate credence allotted to confessions by juries weighing evidence. Thus, it is inconceivable, given the demonstrated problem of wrongful convictions and the concomitant role of false confessions in that epidemic, that this court would refuse the opportunity it is offered to combat this constitutionally abhorrent scourge.

Accordingly, I respectfully dissent.